**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| **CHESAPEAKE BAY FOUNDATION, INC.**<br>6 Herndon Ave<br>Annapolis, MD 21403<br><br>and<br><br>**JAMES RIVER ASSOCIATION**<br>211 Rocketts Way, Suite 200<br>Richmond, MD 23231<br><br>_Plaintiffs,_<br><br>v.<br><br>**COUNTY OF HENRICO**<br>4301 East Parham Road<br>Henrico, VA 23228<br><br>_Defendant._ | **Civil Action No.:**  3:21cv752 |

### COMPLAINT

### STATEMENT OF THE CASE

1.     The Chesapeake Bay Foundation and James River Association (collectively, "Plaintiffs") file this complaint against Henrico County ("Defendant" or "Henrico") for significant and ongoing violations of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 _et. seq_ (hereinafter the Clean Water Act ("CWA" or "Act")), including Defendant's flagrant disregard for the terms of its permit issued under the Virginia Pollution Discharge Elimination

System ("VPDES") at the Henrico County Water Reclamation Facility ("Facility" or "Henrico WRF").

2.      These violations have occurred, and continue to occur, at the Henrico WRF, a publicly owned treatment works located at 9101 WRVA Rd, Henrico, VA 23231, which is owned and operated by Defendant. The Facility began operation in November 1989 and has harmed the integrity and health of the James River and the surrounding environment since that time.

3.      The Facility receives residential, commercial, and industrial pollution from Henrico County (population of 332,538), portions of Hanover County (population of 15,750), portions of the City of Richmond (population of 1,430), portions of Goochland County (population of 7,000), and approximately twenty (20) significant industrial users. The Facility collects untreated wastewater through its sewage collection system, which is comprised of separate sanitary sewer lines for Henrico County, portions of Hanover County and Goochland County, as well as combined sewer lines for a portion of the City of Richmond.

4.      Through its operation and maintenance of the Facility, Defendant has discharged, and continues to discharge, pollutants into waters of the United States in violation of the CWA, 33 U.S.C. §§ 1311, 1342, and the conditions and limitations of the VPDES Permit (Permit No. VA0063690) ("VPDES Permit" or "Permit") issued to the Facility pursuant to the Act, 33 U.S.C. § 1342. The current Permit authorizes the discharge of treated sewage and other wastewater into the James River and establishes effluent load and concentration limits for, among other things, Total Suspended Solids ("TSS") and Carbonaceous Biological Oxygen Demand ("CBOD") and prohibits certain discharges, including untreated sewage. *See* Exhibit A.

5.     The Facility has repeatedly exceeded the discharge limits imposed by the Permit for these pollutants. The excessive amounts of TSS, CBOD, and sewage discharged by the Facility pose significant harm to the ecological integrity of the James River and its tributaries. The presence of these contaminants degrades aquatic life and recreational designated uses. These pollutants can degrade habitat, reduce growth rates, and limit productivity of native species. These contaminants pose health risks to humans, aquatic species, and other wildlife.

6.      TSS refers to the amount of insoluble particles floating in suspension in wastewater. TSS pollution significantly threatens waterways, and the aquatic organisms that inhabit them, by inhibiting the growth of aquatic organisms by smothering them or blocking sunlight. Suspended solids can also carry bacteria and other toxic substances threatening the health of impacted waterways and humans using those rivers, creeks, and streams.

7.     Elevated levels of TSS often translate to an increase in CBOD. CBOD refers to the consumption of dissolved oxygen by microorganisms when they convert organic material into carbon dioxide via respiration. Increased levels of CBOD correspond to a decrease in the available oxygen in an affected waterbody, effectively suffocating the aquatic organisms within it.

8.     Illegal sanitary sewer overflows ("SSOs") from Defendant's operations also result in the discharge of raw sewage into the James River and its tributaries. Raw sewage risks exposure to an array of viruses, bacteria, and parasites. The concentration of contaminants and the unpredictability of the make-up of each SSO event presents a significant health risk to humans and impairs waterways.

9.     Defendant has been provided numerous opportunities, over approximately twenty-eight (28) years, to address egregious and consistent pollution from the Facility through

3

administrative means in collaboration and consultation with the Commonwealth of Virginia. Despite this, the Facility has continued to violate the terms of its VPDES permit and the CWA.

10.     Defendant has been subject to four (4) separate consent orders with the Virginia Department of Environmental Quality ("Department" or "DEQ"), failing each time to develop effective pollution controls or prevent discharges in excess of the terms established by its Permit for any meaningful length of time. The Facility's structural and operational inadequacies have resulted in frequent SSOs and repeated exceedances of the concentration and load limits for TSS and CBOD identified in the VPDES Permit.

11.     The continued operation of the Henrico WRF in this manner presents a significant threat to the chemical, physical, and biological integrity of the James River and its tributaries.

12.     On August 11, 2021, Plaintiffs sent a Notice of Intent to Sue letter ("NOI") to Defendant and other recipients as required by the CWA, 33 U.S.C. § 1365(b)(1)(A). *See* Exhibit B: NOI (Aug. 11, 2021). More than 60 days have passed since the issuance of the letter.

13.     Accordingly, Plaintiffs bring this citizen suit for declaratory and injunctive relief, assessment of civil penalties, and other appropriate relief against Defendant Henrico County for frequent and continuous violations of the CWA, 33 U.S.C. § 1251 *et seq.*

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 33 U.S.C. § 1365(a) (regarding citizen suits under the CWA), and 28 U.S.C. § 1331 (federal question jurisdiction).

15.     Pursuant to 33 U.S.C. § 1365(c), venue is proper because the alleged CWA violations occurred and continue to occur in this District.

16.     Pursuant to the CWA, 33 U.S.C. § 1365(b)(1)(A) (requiring sixty (60) days' notice), this action is proper because Plaintiffs gave notice more than sixty (60) days prior to commencing this action to all required parties, including: 1) County of Henrico; 2) DEQ; and 3) the United States Environmental Protection Agency ("EPA"). *See* Exhibit B: NOI.

17.     Neither EPA nor the Commonwealth of Virginia has commenced or is diligently prosecuting a civil or criminal action against Defendant in a court of the United States or the Commonwealth of Virginia.

18.     Pursuant to the CWA, 33 U.S.C. § 1319(g)(6)(B)(ii), this action is not limited or barred by any pending or potential administrative penalty order because 1) notice has been given in accordance with the CWA, 33 U.S.C. § 1365(b)(1)(A), prior to the Department's commencement of any civil penalties orders against Defendant for the CWA violations alleged in this complaint; and 2) this lawsuit has been filed before the 120th day after the date on which notice was given in accordance with the CWA. DEQ and Henrico signed a proposed administrative consent order with proposed penalties to address the Facility's more recent violations on August 25, 2021, which was published for notice and comment on September 16, 2021 ("Proposed Administrative Consent Order"). Exhibit C. The Proposed Administrative Consent Order has not yet been finalized.

19.     As explained below, Defendant is not operating and maintaining its Facility in a manner that achieves compliance with the CWA and the terms and conditions of the Permit. Therefore, the violations alleged herein will continue until the Court enjoins Defendant from discharging in violation of the Permit and orders Defendant to address and remedy the underlying causes of the violations.

## PARTIES

20.     The Chesapeake Bay Foundation, Inc. ("CBF") is a 501(c)(3) non-profit organization founded in 1967, with the goal of protecting the Chesapeake Bay, and its rivers and streams, by improving water quality and reducing pollution. CBF works to "Save the Bay," and keep it saved. For over fifty (50) years, CBF has worked to restore and protect the Chesapeake Bay though education, advocacy, restoration, and litigation. CBF maintains offices in Richmond and Virginia Beach, Virginia; Annapolis and Easton, Maryland; Harrisburg, Pennsylvania; and the District of Columbia.

21.     CBF represents 300,000 members across the nation, and 91,425 of those members reside in the Commonwealth of Virginia. Many CBF members residing in the Commonwealth live in the James River basin downstream from Defendant's Facility.

22.      Defendant's continued discharges of TSS and CBOD in violation of its VPDES permit and its frequent unpermitted discharges of raw sewage during SSO events threaten CBF's programs, resources, and organizational interests. As part of its efforts to ensure the health of the Chesapeake Bay and encourage thoughtful stewardship of its waterways, CBF has developed restoration projects, operated educational programs, and participated in dedicated advocacy in the James River basin.

23.     As part of its mission to "Save the Bay" CBF is committed to reducing nitrogen, phosphorous and sediment levels in the Chesapeake Bay, the importance of which is established in the Chesapeake Bay Total Maximum Daily Load ("TMDL") and the Chesapeake Bay Agreement. The Defendant's significant and ongoing permit violations introduce harmful levels of TSS, CBOD and raw sewage into the James River, which is a significant tributary of the Chesapeake Bay and harms CBF programs, activities, and operations.

6

24.     CBF's educational programs provide opportunities for students, teachers, and adults to learn about importance of water quality and local issues impacting it. CBF also hosts decision maker trips, which invite local legislators and advocates to experience the James River and develop an understanding of the Chesapeake Bay ecosystem. Both the educational and decision maker trips utilize CBF's resources on the James River downstream from the Facility. CBF's Elisabeth Reed Carter Environmental Educational Program comprises a fleet of ten (10) canoes, which launch from Deep Bottom State Park. The James River Boat Program offers a floating classroom experience aboard the "Baywatcher," a forty-two (42) foot workboat which departs from the Jordan Point Marina, where CBF has maintained a slip for twenty (20) years. CBF's canoeing and boating trips (collectively, "James River Program") operate downstream from the Facility and its Outfall 001. In a typical year, CBF hosts approximately 100 trips per year through its James River Program and logged 7,066 total participant days as part of its James River Program between Fiscal Years 2017–2020. These educational and policy-oriented trips are significantly limited when it is not safe for participants to come into contact with the water. CBF educators rely on statewide warnings and local alerts to determine whether it is safe to operate educational trips on the water. Defendant's effluent violations reduce CBF's ability to work toward its missions and execute its programs as intended.

25.     As part of its policy-driven advocacy, CBF also participates in the development of specific pollution standards designed to restore the health of the Chesapeake Bay. Much of that advocacy focuses on pollution from Bay tributaries such as the James River. In particular, CBF worked to develop nutrient standards for chlorophyll-*a* in the James River and provided scientific support for the development of those standards. The implementation of Chlorophyll-*a* standards is a significant driver of nutrient reductions in the Chesapeake Bay, a central

component of the Chesapeake Bay TMDL. CBF continues to monitor the implementation of

Chlorophyll-*a* standards and these efforts are stifled by the frequent and continuous effluent

violations from the Facility. CBF also participates in the restoration of aquatic organisms and

their habitats in the James River basin. CBF scientists work to encourage the growth of

underwater grasses and the proliferation of freshwater mussels who live in the bottom of streams

and rivers and rely on aquatic vegetation for habitat. In recognition of the importance of viable

habitat, DEQ sets water quality standards for Submerged Aquatic Vegetation ("SAV").

Segments in the tidal freshwater portions of the James have failed to meet SAV targets, partly

due to high concentrations of TSS in the River, and increased nutrients.

26.     CBF's members are harmed by the violations from the Facility and would have

standing to sue in their own right. Many CBF members work, recreate, and live in the

Chesapeake Bay watershed and value its ecological integrity and their personal safety as they

engage with local resources, including the James River and its tributary rivers and streams. CBF

members operate fishing guide trips and engage in recreational activities such as fishing and

trash cleanups in the James River and its tributaries. These activities require individuals to come

into contact with the water, and present significant danger to CBF members who interact with

contaminated water. The Defendant's failure to provide any public notice of its illegal SSO

events renders CBF members unable to protect themselves when engaging in these activities, and

threaten their lives and livelihoods, as well as their ability to fully enjoy their local natural

resources, as a result.

27.     The injuries suffered by CBF and its members as a result of the Defendant's

actions would be redressed by a declaratory judgment that Defendant is in violation of the CWA;

an injunction preventing Defendant from further violating the Act; and an order requiring

Defendant to assess and remediate the harm caused by its violations and imposing civil penalties and the costs of litigation, including attorney's fees and future oversight costs.

28.     The James River Association ("JRA") is a 501(c)(3) non-profit organization established in 1976 and located in Richmond, Virginia. JRA's mission is to restore the James River and improve its water quality. In pursuit of this mission, JRA operates programs relating to watershed restoration, education, outreach, and river advocacy. JRA's RiverRat project provides extensive training and support for JRA members who patrol the James River and its tributaries to monitor and document potential pollution sources and effects, wildlife sightings, and natural patterns in river hydrology. JRA members patrol these waterways by foot, kayak, and boat, and report their findings to JRA and other members through an online portal. JRA also funds and operates other education, outreach, restoration, and advocacy programs in furtherance of JRA's objective to improve water quality in the James River watershed. These programs contribute to JRA's work towards supporting thriving river-based economies and communities, a clean and healthy ecosystem, and sustainable populations of fish and wildlife. JRA owns and operates several boats, canoe rigs, canoes, and kayaks for use in these programs on the James River watershed.

29.     JRA is the only independent private non-profit organization dedicated solely to restoring and protecting the James River and its tributaries. JRA has over 12,000 members and e-subscribers throughout the James River watershed and the rest of Virginia.

30.     JRA's interests, ability to carry out its mission, and programs are harmed by the CWA violations alleged in this complaint. JRA's programs aim to reduce or eliminate the harm or threatened harm to human and environmental health caused by discharges of pollutants, including bacteria, nitrogen, phosphorus, and sediment. Henrico's excessive and illicit discharges

9

of TSS, CBOD, unanticipated partial filter bypasses, and SSOs containing raw sewage laden with bacteria, nutrients, and other pollutants undermine JRA's efforts to carry out its programs to restore the James River.

31.     The Facility's unlawful pollution also undermines JRA's efforts to recover Atlantic sturgeon. The James River provides features essential to Atlantic sturgeon spawning, migration, and recovery. JRA has implemented projects to restore spawning habitat in the James River for the species. In 2013, JRA constructed a 300-foot by 70-foot granite spawning reef for Atlantic sturgeon located approximately one half-mile downstream of the Facility's outfall. JRA monitors the James River annually for interferences with migrations and other impacts on the species' overall health. Sediment pollution leads to the deposition of sediment on the river bottom, which degrades areas used as spawning habitat for Atlantic sturgeon and affects the fragile growth and development of juvenile Atlantic sturgeon.

32.     Reducing the presence of bacteria that contaminates the James River watershed is another critical component to achieving JRA's mission, as demonstrated by its James River Watch Program. Through this program, JRA members collect water quality data, including bacteria information, from the James River and its tributaries to publish online to inform other JRA members and watershed users. In 2020, fifty-seven (57) JRA volunteers dedicated 560 hours to collect 462 bacteria samples in twenty-eight (28) sites throughout the watershed. JRA and its members also work to reduce bacteria in the James River watershed through JRA's River Hero Homes project, where members pledge to adopt river-friendly practices and landscaping to absorb stormwater runoff at their homes. Stopping the illicit discharge of raw sewage into the James River watershed is germane to JRA's mission to protect the quality of these waterways.

33.     Many JRA members are harmed by the CWA violations alleged in this complaint and would have standing to sue in their own right. JRA members include fishermen, boaters, other recreationalists, and business owners who use and enjoy the James River and its tributaries downstream of the Facility's outfall and downstream of illicit SSOs and who depend on the waterways for their livelihood. Defendant's discharges have negatively affected JRA members' use and enjoyment of the James River watershed. JRA's members are fearful over the Facility's excessive and illicit pollution and its effect on their own health and that of their families, community, clients, and the ecosystem of the James River. This concern has caused many JRA members to either reduce or stop their use of the James River watershed downstream of the pollution from the Facility or SSOs events. Other members are concerned over how the pollution will affect their businesses.

34.     These injuries to JRA and its members would be redressed by a declaratory judgment that Defendant is in violation of the CWA; an injunction preventing Defendant from further violating the Act; and an order requiring Defendant to assess and remediate the harm caused by its violations and imposing civil penalties and the costs of litigation, including attorney's fees and future oversight costs.

35.     Defendant Henrico County is a political subdivision of the Commonwealth of Virginia, which is located at 301 East Parham Road, Henrico, VA 23228 with a mailing address at P.O. Box 90775, Henrico VA 23273.

36.     The County of Henrico owns and operates the Henrico WRF, including the Henrico County sewage collection system, and is responsible for its compliance with applicable Federal and State Laws.

11

37.     The County of Henrico has been the owner and operator of the Facility since the Facility began operating and during all time relevant to allegations set forth in this complaint.

38.     Henrico County is a "person" within the meaning provided in the CWA. 33 U.S.C. § 1312.

39.     As a "person," the owner and operator of the Facility, and the holder of the VPDES Permit, Henrico County is responsible for all violations of the Permit and the CWA.

## STATUTORY AND REGULATORY FRAMERWORK

40.     The CWA sets as its goal, the restoration and maintenance of the chemical, physical, and biological integrity of the Nation's waters.

41.     In order to achieve the goals of the CWA, section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the "discharge of any pollutant by any person" into waters of the United States except as in compliance with certain other enumerated sections of the Act, including section 402, 33 U.S.C. § 1342.

42.     The term "discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source . . ." pursuant to section 502(12) of the CWA, 33 U.S.C. § 1362(12).

43.     A "pollutant" is defined as "sewage… sewage sludge…biological materials… and industrial, municipal . . . waste discharged into water" pursuant to section 502(6) of the CWA, 33 U.S.C. § 1362(6).

44.     A "person" is defined as a "State, municipality, commission or political subdivision of a state . . ." pursuant to section 502(5) of the CWA, 33 U.S.C. § 1362(5).

45.     The phrase "navigable waters" is defined as "the waters of the United States . . ." pursuant to section 502(7) of the CWA, 33 U.S.C. § 1362(7).

46.     A "point source" is defined as "any discernable, confined and discrete conveyance, including but not limited to any pipe, ditch . . . conduit . . . discrete fissure, container . . . from which pollutants are or may be discharged . . ." pursuant to section 502(14) of the CWA, 33 U.S.C. § 1362(14).

47.     Section 402 of the CWA, 33 U.S.C. § 1342, establishes the National Pollution Discharge Elimination System ("NPDES"), under which the EPA may issue NPDES permits for point source discharges to waters of the United States.

48.     Section 402(b) of the CWA, 33 U.S.C. § 1342(b), authorizes the Administrator to delegate to the states the authority to issue NPDES permits.

49.     The Commonwealth of Virginia, through DEQ, was delegated the authority to issue NPDES permits in 1975 and has been implementing the federal program since that date through the VPDES program.

50.     The Commonwealth of Virginia exercises its authority to issue NPDES permits through the VPDES in accordance with the Virginia Administrative Code, 9 Va. Admin. Code 25-31-10 *et seq.*

51.     Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), enables citizens to bring suit against "any person . . . who is alleged to be in violation of . . . an effluent standard or limitation" or "an order issued by . . . a State with respect to such a standard or limitation" under the CWA, 33 U.S.C. § 1251 *et seq.*

52.     An "effluent standard or limitation" is defined as "a permit or condition of a permit issued under section 402[, 33 U.S.C. § 1342] . . . that is in effect under [the CWA]" pursuant to 33 U.S.C. § 1365(f)(7).

53.     Section 505(a)(2) of the CWA, 33 U.S.C. § 1365(a)(2), gives district courts the jurisdiction to "enforce such an effluent standard or limitation, or such an order . . . and to apply any appropriate civil penalties . . .."

54.     Section 309(d) of the CWA, 33 U.S.C. § 1319(d), provides that any person who violates section 301, 33 U.S.C. § 1311, or any permit condition or limitation implementing that section or others identified under section 309(d), 33 U.S.C. § 1319(d), in a permit issued under section 402, 33 U.S.C. § 1342, is subject to a civil penalty.

55.     In accordance with the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, any person who violates section 301 of the CWA, 33 U.S.C. § 1311, or any other section identified under 309(d), 33 U.S.C. § 1319(d), or any permit condition or limitation implementing those sections in a permit issued under section 402, 33 U.S.C. § 1342, is subject to a civil penalty of up to $56,460 per day for each CWA or permit violation. 33 U.S.C. § 1319(d). EPA's most recent annual update to the statutory civil penalties, as adjusted for inflation, is effective as of December 23, 2020. 40 C.F.R. § 19.4.

## FACTUAL BACKGROUND

56.     The Henrico WRF is owned and operated by the County of Henrico. Henrico County adopted the County Manager form of government in 1934, in which a County Manager is overseen by a board of elected supervisors.

57.     As a political subdivision of the Commonwealth of Virginia, the County of Henrico is a "person" as defined in section 502(5) of the CWA, 33 U.S.C. § 1362(5).

58.     Henrico is authorized to discharge treated wastewater via Outfall 001 to the James River.

59.     Outfall 001 is a "point source" as defined by the CWA section 502(14), 33 U.S.C. § 1362 (14).

60.     The Facility's sewage collection system is surrounded by several waterways, including the James River and the following tributaries: Gillies Creek, Brandy Branch, Meredith Branch, an Unnamed Tributary to Gillies Creek, Horse Swamp Creek, Almond Creek, Stony Run, White Oak Swamp, Fourmile Creek, Upham Creek, Hungary Creek, Horsepen Branch, Rocky Branch, Trumpet Branch, Roundabout Creek, and Laketon in the Lower James River Basin; Tuckahoe Creek, Stony Run, Cabin Branch, and an Unnamed Tributary to Deep Run in the Middle James River Basin; and an Unnamed Tributary to Opossum Creek in the York River Basin.

61.     Henrico is not authorized to discharge untreated sewage to the James River, and it has no authorization to discharge pollutants to any of its tributaries.

62.     The James River is the largest river in Commonwealth of Virginia, beginning at the confluence of the Cowpasture and Jackson Rivers in Botetourt County and emptying into Chesapeake Bay. The James River watershed is divided into three (3) "basins": the Upper, Middle and Lower. The Upper basin begins in Botetourt County and ends in Lynchburg. The Middle basin runs from Lynchburg to the fall line in Richmond. The Lower James River basin runs from the fall line in Richmond to the Chesapeake Bay. The Henrico WRF affects the Middle and Lower James River basins.

63.     The James River is approximately 340 miles long and is fed by 25,000 miles of tributaries. The James encompasses 10,000 square miles, covering roughly 25% of the state. With connections to thirty-nine (39) counties and nineteen (19) cities and towns, Virginians are more likely to interact with the James River than any other natural feature in the Commonwealth.

15

64.     The James River is a "navigable water" as defined by section 502(7) of the CWA, 33 U.S.C. § 1362(7).

65.     The James is Virginia's largest tributary to the Chesapeake Bay, providing drinking water, commerce, and recreation to Virginians and visitors worldwide.

66.     The Chesapeake Bay is currently governed by the Chesapeake Bay TMDL, a federal, multi-jurisdictional effort to reduce the level of sediments and nutrients in its watershed and restore clean water to the Bay and its tributaries. As the third largest tributary to the Chesapeake Bay, the Lower James River Basin has been assigned a specific pollution reduction goal, pursuant to the Chesapeake Bay TMDL, for nitrogen, phosphorous and sediment. The James River has been specifically identified though this mechanism for more stringent chlorophyll-*a* reductions in an effort to protect local water quality. Recent modeling has shown that more stringent waste load allocations are necessary for facilities discharging nitrogen and phosphorous to the James River.

67.     The continued endangerment of these waters by the Facility only serves to do further damage to an already precarious ecosystem. The James River, along with several tributaries, was assessed as impaired in 2008. Specifically, the James River is impaired for recreational use due to *E. Coli*, for fish consumption due to a Virginia Department of Health Fish Consumption Advisory for polychlorinated biphenyls ("PCBs") and due to water column PCB exceedances.

68.     The James is further impaired for public water supply use due to PCB water column exceedances, and for aquatic life use due to inadequate SAV, altered benthic community, and elevated chlorophyll-*a*.

69.     Without sufficient regulation and enforcement, the Facility will continue to violate the CWA and the terms and conditions of its permit and poses a significant threat to the federally established pollution goals identified for the James River and its tributaries and significantly limits the health, safety and recreational opportunities of the Virginians who live and work through the James River basin.

### *Administrative Consent Orders and Amendments (1998–2017)*

70.     The Henrico WRF began operating in November 1989. Between August 3, 1989, and January 8, 1993, the Facility received twenty-three (23) Notices of Violation ("NOVs"). Exhibit D at 2. These issues led to the development of a voluntary administrative consent order, issued by Commonwealth of Virginia State Water Control Board, and approved by DEQ on June 1, 1993 ("1993 Consent Order"). Exhibit D: 1993 Consent Order. That order directed Henrico County to implement a schedule of compliance addressing effluent limitations for fecal coliform and ammonia nitrogen through effluent filtration, ozone disinfection, and inflow and infiltration projects. Exhibit D:1993 Consent Order at 1–3, App. A.

71.     The 1993 Consent Order did not assess any penalty or include stipulated penalty provisions. *See generally id.*

72.     In the period between February 5, 1993, and August 4, 1994, the Facility received thirteen (13) NOVs. Exhibit E, at 1. During that time the Facility failed to meet its Permit limits for TSS and CBOD and interim effluent limits set by the 1993 Consent Order for fecal coliform. Exhibit E: 1994 Consent Order Amendment at 1, App. A. As a result, in September 1994, the State Water Control Board approved an amendment to 1993 Consent Order. The September 1994

amendment attributed these violations to a failure of the Facility's effluent filtration system and issued an updated schedule of compliance. *Id.*

73.     On February 19, 1998, an administrative consent order was issued to Henrico County to address SSO violations from Henrico's sewage collection system. Exhibit F: 2003 Consent Order, Section C ¶ 2. That order required rehabilitation of nine (9) sewer collection subsystems. *Id.* The County failed to meet the schedule identified in this order resulting in the issuance of another NOV on November 23, 1999. *Id.*

74.     On November 2, 2001, a NOV was issued to Henrico for violations of TSS and CBOD reported by the County during the March through August 2001 monitoring periods. An additional NOV was issued on April 16, 2002, for TSS, total phosphorous and ammonia violations during the December 2001 through February 2002 monitoring periods. The April NOV also cited the County for nineteen (19) sanitary sewer overflows that occurred between September 1, 2001, and April 6, 2002. These NOVs were followed by several additional sewage overflows. Exhibit F: 2003 Consent order, Section C ¶ 3-4.

75.     On January 7, 2003, the DEQ and the County entered into another administrative consent order ("2003 Consent Order") to address consistent TSS, CBOD, total phosphorus, ammonia nitrogen, and chlorine effluent violations as well as continued SSOs containing raw sewage. Exhibit F: 2003 Consent Order, Section C ¶¶ 3–7.

76.     The 2003 Consent Order assessed a civil charge of $25,500 and required the County to develop and implement a formal operation and maintenance manual to address effluent limitation violations and submit a schedule of completion for several inflow and

infiltration projects to be completed by January 15, 2007, to address the SSOs. *Id.*, Section D, App. A.

77.     On February 7, 2005, a consent order amendment was issued, altering the 2003 Consent Order to incorporate an additional inflow and infiltration project. Exhibit G: 2005 Consent Order Amendment, Section B ¶ 4.

78.     On September 27, 2007, Henrico and DEQ entered into another consent order amendment to confirm the County's completion of all of the corrective actions required to address the effluent violations identified under the 2003 Consent Order. The Amendment extended the schedule to complete the inflow and infiltration projects necessary to resolve the SSO violations. *See* Exhibit H: 2007 Consent Order Amendment.

79.     On December 17, 2010, DEQ and Henrico entered into yet another administrative consent order ("2010 Consent Order") following a renewed series of SSO discharges and effluent limit violations by the Facility. The 2010 Consent Order was limited in scope, dismissing the effluent violations, and instead addressing twenty-six (26) unauthorized SSOs occurring from June 20, 2009, through December 3, 2009, and fifty (50) additional SSOs occurring from December 3, 2009, to June 11, 2010. Exhibit I: 2010 Consent Order, Section C ¶¶ 2–7, 9, 10, 13–15; *see also id.* App. A.

80.     The 2010 Consent Order required Henrico to complete several inflow and infiltration projects designed to eliminate ongoing illicit SSOs and instituted a Schedule of Compliance ending on June 15, 2018. *Id.*, App. A. The order also required Henrico to submit to the Department for approval, and then implement, standard operating procedures for the most optimal plant configuration and process modes for a given set of flow, temperature, and influent loading conditions. *Id.* Other than this requirement, the order did not include any other projects

19

to remedy TSS and CBOD effluent violations from the facility as it claimed the Facility had lost

the necessary nitrification capability due to influent flow beyond its capacity.

81.     The 2010 Consent Order required Henrico to pay a civil administrative penalty of

$29,500, resolved only those violations specifically identified within, and did not include any

stipulated penalty provisions for future violations. *Id.*, Section D, Section E ¶ 2. The 2010 order

also terminated the 2003 Consent Order and the related amendments. *Id.*, Section D. Importantly,

public documents obtained through a February 22, 2021, Freedom of Information Act request to

DEQ show no evidence of civil or administrative penalties assessed or paid since the 2010

Consent Order was signed.

82.     Henrico completed all the projects listed in the 2010 Consent Order by April

2018. Exhibit C: Proposed Administrative Consent Order Section C ¶ 6. However, the work

undertaken by Henrico pursuant to the 2010 Consent Order failed to curb Henrico's frequent and

recurring SSO events. In addition, the effluent limit violations at the Facility restarted in 2019.

Since 2016, Henrico discharged over sixty-six (66) million gallons of sewage into the James

River and its tributary creeks and streams, with over fifty-six (56) million gallons released after

Henrico completed the projects required under the 2010 Consent Order. Exhibit J: Compilation

of Henrico County, Unauthorized Discharge and Overflow Reports (Sept. 28, 2016 – Oct. 7,

2021) ("Henrico SSO Reports").

### *Current Virginia Pollution Discharge Elimination System Permit*

83.     On May 31, 2017, the Facility's VDES Permit (Permit No. VA0063690) was

renewed by DEQ ("2017 Permit"). The Permit is effective June 1, 2017, to May 31, 2020. The

Permit has been administratively continued.

84. The current VPDES permit acknowledges the Facility has a design flow of seventy-five (75) million gallons per day and sets limitations for, among other things, TSS and CBOD. For Outfall 001, the Permit requires Henrico to report and adhere to the following monthly average and weekly average discharge limitations for concentrations and/or loads:

    a. TSS

        i. Monthly average concentration 8.0 milligrams per liter ("mg/L"), monthly average load 2,300 kilograms per day ("kg/day"), weekly average concentration 12.0 mg/L, weekly average load 3,400 kg/day.

    b. CBOD

        i. June 1 – October 31: monthly average concentration 5.0 mg/L, monthly average load 1,361 kg/day, weekly average concentration 7.0 mg/L, weekly average load 2,044 kg/day.

        ii. November 1 – May 31: monthly average concentration 8.0 mg/L, monthly average load 2,157 kg/day, weekly average concentration 11.0 mg/L, weekly average load 3,236 kg/day.

85. Outfall 001 is a "point source" as defined by section 502(14) the CWA, 33 U.S.C. § 1362(14).

86. In addition to the above requirements, Part II of the VPDES Permit:

    a. Prohibits certain discharges, including "sewage, industrial wastes, other wastes, or any noxious or deleterious substances . . .." If any sewage overflows occur, the permittee must notify DEQ of such unauthorized discharges within twenty-four (24) hours from when the permittee becomes aware of the circumstances and submit a written report within five (5) days to

21

DEQ documenting, among other things, "[a] description of the nature and location of the discharge," "[t]he cause of the discharge", "[t]he date on which the discharge occurred," and "[t]he volume of the discharge."

b. Prohibits unanticipated bypass of wastewater unless the bypass was (1) unavoidable to prevent loss of life, personal injury, or severe property damage; (2) there was no feasible alternative to the bypass; and (3) the permittee submitted notices to DEQ.

c. Requires "at all times [the] proper operat[ion] and maint[enance of] all facilities and systems of treatment and control (and related appurtenances) which are installed or used by the permittee to achieve compliance with the conditions" of the Permit.

### *Recent Violations and Enforcement Actions*

<u>Effluent Violations</u>

87.     Following the issuance of the 2017 Permit, the Defendant again received numerous NOVs and Warning Letters for effluent concentration and load limitation exceedances.

88.     On May 7, 2019, DEQ issued a Warning Letter detailing exceedances for TSS concentration and load limits. *See* Exhibit K: DEQ, Henrico County Warning Letter (May 7, 2019).

89.     On April 3, 2020, Henrico was sent a NOV reiterating previously identified violations that occurred in February 2020, relating to the TSS concentration and load limits established in its VPDES Permit. *See* Exhibit L: DEQ, Henrico County Notice of Violation (Apr. 3, 2020).

90.     On June 3, 2020, Henrico received a NOV detailing March 2020 and April 2020 violations, again pertaining to TSS concentration and load limits, as well as CBOD concentrations and load limits. *See* Exhibit M: DEQ, Henrico County Notice of Violation (June 3, 2020).

91.     On August 11, 2020, DEQ issued another NOV for May 2020 and June 2020 effluent violations for TSS concentration and load limit exceedances. *See* Exhibit N: DEQ, Henrico County Notice of Violation (Aug. 11, 2020).

Sanitary Sewer Overflows

92.     SSOs have been a persistent facet of the Facility's noncompliance. During a DEQ site inspection following a July 18, 2018, SSO event, a representative evaluating the area "observed evidence of long-term overflow of sewage at the location based on excessive bacterial growth on the stream bottom as well as the existence of aged sewage solids." Exhibit O: DEQ, Henrico County Notice of Violation (Sept. 18, 2018) ("Sept. 18, 2018 NOV") at 2. The representative also noted a prominent sewage odor and stated that Almond Creek, a James River tributary, appeared to be turbid and gray. *Id.* The event that necessitated the inspection lasted 585 minutes and released an estimated 144,495 gallons of sewage into Almond Creek. *Id.* at 2; *see also* Exhibit J: Henrico SSO Reports.

93.     On September 18, 2018, DEQ issued a NOV for fifty-nine (59) individual SSO events that occurred between September 28, 2016, and August 18, 2018. *See* Sept. 18, 2018 NOV at 1–3; *see also* Table 10.

94.     On February 21, 2019, DEQ issued another NOV for twenty-nine (29) additional unpermitted SSOs from the Facility's collection system, occurring between September 17, 2018,

and January 15, 2019. *See* Exhibit P: DEQ, Henrico County Notice of Violation (Feb. 21, 2019); *see also* Table 10.

95.    On April 18, 2019, DEQ again issued a NOV for thirteen (13) additional unpermitted SSOs occurring between January 17, 2019, and April 15, 2019. *See* Exhibit Q: DEQ, Henrico County Notice of Violation (Apr. 18, 2019); *see also* Table 10.

96.     On August 15, 2019, DEQ issued a NOV for five (5) unpermitted SSOs occurring between April 19, 2019, and July 8, 2019. *See* Exhibit R: DEQ, Henrico County Notice of Violation (Aug. 15, 2019); *see also* Table 10.

97.    Since September 2019, Henrico has reported several additional SSO events which account for millions of gallons of illicit sewage discharged. *See* Exhibit J: Henrico SSO Reports; *see also* Table 10. Thus, these are ongoing SSO events that are likely to recur without corrective action by the court.

Unanticipated Partial Filter Bypass Events

98.    In addition to violations noticed by DEQ, Henrico has also identified and reported prohibited recent, recurring, unanticipated filter bypass events. This action and the written reports provided are a requirement of the Facility's VPDES permit.

99.    The 2017 Permit defines a "bypass" as the "intentional diversion of water streams from any portion of a treatment facility."

100.    Bypasses are prohibited by Henrico's VPDES Permit unless they were unavoidable to prevent loss of life, injury, or severe property loss and there were no feasible alternatives to the bypass. Henrico's written reports notifying DEQ of these bypasses provide no indication that these conditions were satisfied, showing these bypass events were violations of the VPDES Permit.

101.    Henrico attributed unanticipated partial bypass events occurring on February 11, 2021; February 12, 2021; February 13–15, 2021; February 16–18, 2021; February 19–21, 2021; February 22, 2021; February 22–24, 2021; February 25, 2021; February 26, 2021; and February 27–28, 2021, to filter cells being out of service for maintenance. *See* Exhibit S: Compilation of 2021 Partial Filter Bypass Notifications and Written Reports (Feb. 11, 2021 – Mar. 6, 2021) ("Bypass Reports").

102.    Henrico attributed unanticipated partial bypass events occurring on March 1–4, 2021; March 4–5, 2021; and March 6, 2021, to a combination of increased pollutant loads and the failure of three primary clarifiers. *See id.*

103.    Henrico attributed unanticipated partial bypass events occurring on March 24–25, 2021; March 26, 2021; March 27, 2021; March 28, 2021; March 28–29, 2021; March 29–30, 2021; March 31, 2021; March 31–April 1, 2021; April 2–4, 2021; April 5, 2021; April 15, 2021; April 27, 2021; April 28–29, 2021; April 30, 2021; June 12, 2021; and June 15, 2021, to equipment failure. *See id.*

104.    In addition to the bypass events above, EPA's Enforcement and Compliance Online ("ECHO") webpage for the Facility (https://echo.epa.gov/detailed-facility-report?fid=110008189762) indicates that unapproved bypass events also occurred on September 16, 2021; October 3, 2021; and October 7, 2021.

<u>2021 Proposed Administrative Consent Order</u>

105.    On August 25, 2021, DEQ and Henrico signed the Proposed Administrative Consent Order to address the Facility's recent violations. Exhibit C. On September 16, 2021, the Proposed Administrative Consent Order was published for notice and comment. The Proposed Administrative Consent Order has not been finalized.

106.    To resolve the Facility's effluent limitations and illicit SSOs, the Proposed Administrative Consent Order assessed an administrative penalty of $207,680—requiring Henrico to pay $51,920 in administrative penalties and allowing Henrico to conduct a Supplemental Environmental Project to satisfy the rest of the $155,750 assessed. *Id.*, Section D ¶ 2. The Proposed Administrative Consent Order aims to resolve these SSO violations from Henrico's sewage collection system. The schedule of work contains many of the same types of projects (i.e., repairing and replacing outdated and broken pipes) as the previous consent orders and does not include long-term deliverables that would offer a sustainable solution to Henrico's SSO problems. *Id.*, App. B. The Proposed Administrative Consent Order also aims to resolve effluent limit exceedances and partial filter bypass event violations from the Facility, mostly by requiring replacement of existing equipment. *Id.*, App. C. The Proposed Administrative Consent Order does not propose any stipulated penalties for future violations.

107.    The Proposed Administrative Consent Order will not resolve Henrico's effluent limit, partial filter bypass, and SSO violations because it fails to include more than minor mechanical upgrades to the Facility and fails to include projects aimed to stop or substantially minimize the frequent SSOs from the Henrico sewage collection system.

108.    Henrico County has yet to demonstrate a desire or intention to comply with the CWA or the terms of its VPDES Permit. There is no indication that yet another consent order, with substantially similar terms provisions, will provide any incentive to resolve decades of non-compliance.

## CAUSES OF ACTION

### Count 1:  Violations of Effluent Load Limitations of the VPDES Permit

109.    Paragraphs 1 through 108 are incorporated herein by reference.

26

110.     Henrico has violated, and continues to violate, the terms and conditions of its VPDES permit and section 301(a) of the CWA, 33 U.S.C. § 133(a), which makes unlawful the discharge of any pollutant into waters of the United States by any person, except as in compliance with other identified sections of the Act.

111.     Section 402 of the CWA, 33 U.S.C. § 1342, establishes the NPDES program and authorized the Administrator to issue permits pursuant to that program. The Administrator is also entitled to delegate to the states, the authority to issue permits, pursuant to section 402(b), 33 U.S.C. § 1342(b).

112.     In accordance with section 402(b), 33 U.S.C. § 1342(b), the Commonwealth of Virginia, through DEQ, was delegated the authority to issue NPDES permits in 1975. The Commonwealth and DEQ have carried out this process through the VPDES Program. 9 Va. Admin Code 25-31-10 *et seq*.

113.     The Facility's designated Outfall 001, and the sewage collection system that it relies on, are point sources within the definition provided by section 502(14) the CWA, 33 U.S.C. § 1352(14).

114.     Henrico, through its operation of the Facility has consistently exceeded its monthly average effluent limits for TSS nine (9) times in the past three (3) years.

115.     Henrico, through its operation of the Facility has consistently exceeded its weekly average effluent limits for TSS ten (10) times in the past three (3) years.

116.     Each day of the month in which Henrico exceeded the monthly average load limit, and each day of the week in which Henrico exceeded its weekly average load limit are separate violations for which a penalty of up to $56,460 can be assessed.

**Table 1. Violations of Monthly Average Load Limit for TSS (2,300 kg/day)**

| Monitoring Period | Reported Discharge | % Exceedance |
|---|---|---|
| Mar. 2019 | 2,800 kg/d | 21.74% |
| Feb. 2020 | 10,497 kg/d | 356.39% |
| Apr. 2020 | 15,423 kg/d | 570.57% |
| May 2020 | 5,740 kg/d | 149.57% |
| Aug. 2020 | 3,970 kg/d | 72.61% |
| Nov. 2020 | 2,956 kg/d | 28.52% |
| Dec. 2020 | 7,241 kg/d | 214.83% |
| Feb. 2021 | 6,085 kg/d | 164.57% |
| Mar. 2021 | 7,000 kg/d | 204.35% |

**Table 2. Violations of Weekly Average Load Limit for TSS (3,400 kg/day)**

| Monitoring Period | Reported Discharge | % Exceedance |
|---|---|---|
| Mar. 2019 | 11,000 kg/d | 223.53% |
| Feb. 2020 | 38,913 kg/d | 1044.50% |
| Apr. 2020 | 27,750 kg/d | 716.18% |
| May 2020 | 7,028 kg/d | 106.71% |
| June 2020 | 4,321 kg/d | 27.09% |
| Aug. 2020 | 9,082 kg/d | 167.12% |
| Nov. 2020 | 8,529 kg/d | 150.85% |
| Dec. 2020 | 13,439 kg/d | 295.26% |
| Feb. 2021 | 18,816 kg/d | 453.41% |
| Mar. 2021 | 16,409 kg/d | 382.62% |

117.    Through its operation of the Facility, Henrico exceeded its monthly average effluent load limit for CBOD two (2) times in the past three (3) years.

118.    Through its operation of the Facility, Henrico exceeded its weekly average effluent load limit for CBOD four (4) times in the past three (3) years.

119.    Each day of the month in which the discharged effluent exceeded the monthly average load limit for CBOD and each day of the week in which the discharged effluent

exceeded the weekly average load limit for CBOD is a separate violation of the Facility's

VPDES Permit, and the CWA, for which a penalty of up to $56,460 can be assessed.

**Table 3. Violations of Monthly Average Load Limit for CBOD**
**(2,157 kg/day for November 1 – May 31)**

| Monitoring Period | Reported Discharge | | % Exceedance |
|---|---|---|---|
| Apr 2020 | 3,944 | kg/d | 82.85% |
| Feb 2021 | 2,394 | kg/d | 10.99% |

**Table 4. Violations of Weekly Average Load Limit for CBOD**
**(2,044 kg/day for June 1 – October 31; 3,236 kg/day for November 1 – May 31)**

| Monitoring Period | Limit | | Reported Discharge | | % Exceedance |
|---|---|---|---|---|---|
| Apr 2020 | 3,236 | kg/d | 9,011 | kg/d | 178.46% |
| Aug 2020 | 2,044 | kg/d | 2,620 | kg/d | 28.18% |
| Dec 2020 | 3,236 | kg/d | 3,245 | kg/d | 0.28% |
| Feb 2021 | 3,236 | kg/d | 6,744 | kg/d | 108.41% |

**Count 2: Violations of Effluent Concentrations Limitations in the VPDES Permit**

120.    Paragraphs 1 through 119 are incorporated herein by reference.

121.    Through its operation of the Facility, Henrico consistently exceeded its monthly average effluent concentration limit for TSS ten (10) times in the past three (3) years.

122.    Through its operation of the Facility, Henrico consistently exceeded its weekly average effluent concentration limit for TSS twelve (12) times in the past three (3) years.

123.    Each day of the month in which the discharged effluent exceeded the monthly average concentration limit for TSS and each day of the week in which the discharged effluent exceeded the weekly average concentration limit for TSS is a separate violation of the VPDES Permit and the CWA for which a penalty of up to $56,460 can be assessed.

**Table 5. Violations of Monthly Average Concentration Limit for TSS (8.0 mg/L)**

| Monitoring Period | Reported Discharge | | % Exceedance |
|---|---|---|---|
| Mar. 2019 | 12.3 | mg/L | 53.75% |
| Feb. 2020 | 38.6 | mg/L | 382.50% |
| Apr. 2020 | 93.7 | mg/L | 1,071.25% |
| May 2020 | 27.8 | mg/L | 247.50% |
| June 2020 | 14.3 | mg/L | 78.75% |
| Aug. 2020 | 14.7 | mg/L | 83.75% |
| Nov. 2020 | 11.2 | mg/L | 40.00% |
| Dec. 2020 | 26.1 | mg/L | 226.25% |
| Feb. 2021 | 21.7 | mg/L | 171.25% |
| Mar. 2021 | 28.5 | mg/L | 256.25% |

**Table 6. Violations of Weekly Average Concentration Limit for TSS (12.0 mg/L)**

| Monitoring Period | Reported Discharge | | % Exceedance |
|---|---|---|---|
| Feb. 2019 | 12.5 | mg/L | 4.17% |
| Mar. 2019 | 46 | mg/L | 283.33% |
| Feb. 2020 | 136 | mg/L | 1,033.33% |
| Mar. 2020 | 18 | mg/L | 50.00% |
| Apr. 2020 | 177 | mg/L | 1,375.00% |
| May 2020 | 48.5 | mg/L | 304.17% |
| June 2020 | 29 | mg/L | 141.67% |
| Aug. 2020 | 34.9 | mg/L | 190.83% |
| Nov. 2020 | 27.6 | mg/L | 130.00% |
| Dec. 2020 | 48.1 | mg/L | 300.83% |
| Feb. 2021 | 63 | mg/L | 425.00% |
| Mar. 2021 | 70.9 | mg/L | 490.83% |

124.    Through its operation of the Facility, Henrico exceeded its monthly average effluent concentration limit for CBOD one (1) time in the past three (3) years.

125.    Through its operation of the Facility, Henrico exceeded its weekly average effluent concentration limit for CBOD four (4) times in the past three (3) years.

126.    Each day of the month in which the discharged effluent exceeded the monthly average concentration limit for CBOD and each day of each week in which the discharged

effluent exceeded the weekly average concentration limit for CBOD is a separate violation of the

VPDES Permit and the CWA, for which a penalty of up to $56,460 can be assessed.

**Table 7. Violations of Monthly Average Concentration Limit for CBOD**
**(8.0 mg/L for November 1 – May 31)**

| Monitoring Period | Reported Discharge | | % Exceedance |
|---|---|---|---|
| Apr. 2020 | 24 | mg/L | 200.00% |

**Table 8. Violations of Weekly Average Concentration Limit for CBOD**
**(7.0 mg/L for June 1 – October 31; 11.0 mg/L for November 1 – May 31)**

| Monitoring Period | Reported Discharge | | % Exceedance |
|---|---|---|---|
| Apr. 2020 | 56 | mg/L | 409.09% |
| Aug. 2020 | 10 | mg/L | 42.86% |
| Dec. 2020 | 14 | mg/L | 27.27% |
| Feb. 2021 | 22 | mg/L | 100.00% |

**Count 3: Unanticipated Filter Bypasses**

127.    Paragraphs 1 through 126 are incorporated herein by reference.

128.    Pursuant to the VPDES Permit, bypasses are prohibited unless they are

unavoidable to prevent loss of life, injury, or severe property loss and there were no alternatives

to the bypass. In written reports submitted to DEQ by Henrico, there are no details provided to

suggest that these conditions were met.

129.    Through its operation of the Facility, Henrico has discharged thirty (30)

unanticipated partial filter bypasses of its waste system since the beginning of 2021. Thirteen

(13) of those bypass events lasted multiple days.

130.    Each day that Henrico released untreated wastewater through an unanticipated

bypass event into a receiving waterway is a separate violation of the VPDES Permit and the

CWA, for which a penalty of up to $56,460 can be assessed.

**Table 9. Unanticipated Partial Filter Bypasses**

| No. | Unanticipated Partial Filter Bypass Events |
|-----|-------------------------------------------|
| 1 | Start time – 2/11/21 at 12:06 AM / Stopped bypassing – 2/11/21 at 8:25 AM |
| 2 | Start time – 2/12/21 at 11:46 PM / Stopped bypassing – 2/12/21 at 6:16 PM |
| 3 | Start time – 2/13/21 at 7:08 AM / Stopped bypassing – 2/15/21 at 11:59 PM |
| 4 | Start time – 2/16/21 at 12:00 AM / Stopped bypassing – 2/18/21 at 11:59 PM |
| 5 | Start time – 2/19/21 at 12:00 AM / Stopped bypassing – 2/21/21 at 11:59 PM |
| 6 | Start time – 2/22/21 at 12:00 AM / Stopped bypassing – 2/22/21 at 12:01 PM |
| 7 | Start time – 2/22/21 at 1:05 PM / Stopped bypassing – 2/24/21 at 8:15 AM |
| 8 | Start time – 2/25/21 at 9:01 AM / Stopped bypassing – 2/25/21 at 7:55 PM |
| 9 | Start time – 2/26/21 at 2:40 AM / Stopped bypassing – 2/26/21 at 9:27 AM |
| 10 | Start time – 2/27/21 at 12:13 AM / Stopped bypassing – 2/28/21 at 11:59 PM |
| 11 | Start time – 3/1/21 at 12:00 AM / Stopped bypassing – 3/4/21 at 1:11 PM |
| 12 | Start time – 3/4/21 at 3:45 PM / Stopped bypassing – 3/5/21 at 5:40 PM |
| 13 | Start time – 3/6/21 at 10:11 AM / Stopped bypassing – 3/6/21 at 12:20 PM |
| 14 | Start time – 3/24/21 at 3:34 PM / Stopped bypassing – 3/25/21 at 11:59 PM |
| 15 | Start time – 3/26/21 at 12:00 AM / Stopped bypassing – 3/26/21 at 9:25 AM |
| 16 | Start time – 3/27/21 at 12:06 AM / Stopped bypassing – 3/27/21 at 11:59 PM |
| 17 | Start time – 3/28/21 at 12:00 AM / Stopped bypassing – 3/28/21 at 9:23 AM |
| 18 | Start time – 3/28/21 at 8:11 PM / Stopped bypassing – 3/29/21 at 2:17 PM |
| 19 | Start time – 3/29/21 at 8:06 PM / Stopped bypassing – 3/30/21 at 3:08 PM |
| 20 | Start time – 3/31/21 at 2:36 AM / Stopped bypassing – 3/31/21 at 10:15 AM |

| No. | Unanticipated Partial Filter Bypass Events |
|---|---|
| 21 | Start time – 3/31/21 at 4:49 PM / Stopped bypassing – 4/1/21 at 11:59 AM |
| 22 | Start time – 4/2/21 at 12:00 AM / Stopped bypassing – 4/4/21 at 12:33 PM |
| 23 | Start time – 4/5/21 at 1:47 AM / Stopped bypassing – 4/5/21 at 2:28 AM |
| 24 | Start time – 4/5/21 at 6:10 AM / Stopped bypassing – 4/5/21 at 6:54 AM |
| 25 | Start time – 4/15/21 at 3:52 AM / Stopped bypassing – 4/15/21 at 7:12 AM |
| 26 | Start time – 4/27/21 at 6:18 AM / Stopped bypassing – 4/27/21 at 7:07 AM |
| 27 | Start time – 4/28/21 at 7:52 PM / Stopped bypassing – 4/29/21 at 6:35 AM |
| 28 | Start time – 4/30/21 at 3:41 PM / Stopped bypassing – 4/30/21 at 4:13 PM |
| 29 | Start time – 6/12/21 at 3:29 AM / Stopped bypassing – 6/12/21 at 5:15 AM |
| 30 | Start time – 6/15/21 at 1:34 PM / Stopped bypassing – 6/15/21 at 5:17 PM |
| 31 | 9/16/21* |
| 32 | 10/3/21* |
| 33 | 10/7/21* |

*EPA's ECHO webpage for the Facility (https://echo.epa.gov/detailed-facility-report?fid=110008189762) indicates that unapproved bypass events also occurred on these dates.


**Count 4: Unpermitted Sanitary Sewer Overflows**


131.     Paragraphs 1 through 130 are incorporated herein by reference.

132.     Pursuant to the VPDES Permit, Henrico is authorized to discharge ***treated***

wastewater through Outfall 001, into the James River.

133.     The VPDES Permit explicitly prohibits the discharge of "sewage, industrial

wastes, other wastes, or any noxious or deleterious substances . . . .'"

134.     Henrico has had numerous SSOs discharging raw sewage into the James River

and its tributaries, including over the past 5 years.

135.    From September to December 2016, Henrico was responsible for the discharge of 9,354,470 gallons of raw, untreated sewage into the James River and its tributaries.

136.    In 2017, Henrico was responsible for the discharge of 279,970 gallons of raw, untreated sewage into the James River and its tributaries.

137.    In 2018, Henrico was responsible for the discharge of 48,993,824 gallons of raw, untreated sewage into the James River and its tributaries.

138.    In 2019, Henrico was responsible for the discharge of 1,268,936 gallons of raw, untreated sewage into the James River and its tributaries.

139.    In 2020, Henrico was responsible for the discharge of 4,727,888 gallons of raw, untreated sewage into the James River and its tributaries.

140.    From January 1, 2021, through October 7, 2021, Henrico was responsible for the discharge of 1,256,878 gallons of raw, untreated sewage into the James River and its tributaries.

**Table 10. Henrico Sanitary Sewer Overflows (September 2016 – June 2021)**

| Date(s) | Receiving Stream | Volume Discharged (gallons) |
|---|---|---|
| 9/28/2016 | Almond Creek | 92,300 |
| 9/29/2016 | Upham Brook | 3,150 |
| 9/29/2016 | North Run | 1,575 |
| 9/29/2016 | Broadwater Creek | 125,700 |
| 9/29/2016 | Horse Swamp Creek | 2,370,000 |
| 9/29/2016 | Gillies Creek | 673,000 |
| 9/30/2016 | Gillies Creek | 433,000 |
| 10/8/2016 | Upham Brook | 38,250 |
| 10/8/2016 | Horse Swamp Creek | 2,850,000 |
| 10/8/2016 | Almond Creek | 180,000 |
| 10/8/2016 | Gillies Creek | 96,000 |
| 10/8/2016 | Lake Overton | 21,600 |
| 10/8/2016 | James River | 47,250 |
| 10/9/2016 | Kanawha Canal | 8,000 |
| 10/9/2016 | Upham Brook | 12,725 |
| 10/9/2016 | Upham Brook | 27,500 |

| Date(s) | Receiving Stream | Volume Discharged (gallons) |
|---|---|---|
| 10/9/2016 | Tuckahoe Creek | 2,170,000 |
| 10/9/2016 | Broadwater Creek | 110,000 |
| 10/9/2016 | Upham Brook | 57,400 |
| 10/12/2016 | Chickahominy River | 9,420 |
| 11/21/2016 | Tuckahoe Creek | 13,500 |
| 11/26/2016 | Hungary Creek | 14,100 |
| 1/19/2017 | Horse Swamp Creek | 6,750 |
| 1/23/2017 | Gillies Creek | 9,000 |
| 1/23/2017 | Almond Creek | 188,700 |
| 1/24/2017 | Trib. To Piney Branch | 750 |
| 3/17/2017 | Horse Swamp Creek | 1,075 |
| 3/22/2017 | Stony Run | 1,620 |
| 4/18/2017 | Upham Brook | 2,400 |
| 4/21–22/2017 | Trib. To Beaverdam Creek | 5,100 |
| 5/1/2017 | Rooty Branch Creek | 8,000 |
| 5/5/2017 | Trib. To Horsepen Branch | 485 |
| 5/8/2017 | Rocky Branch | 384 |
| 6/16/2017 | Upham Brook | 22,500 |
| 6/16/2017 | Upham Brook | 9,000 |
| 6/17/2017 | Lake Overton | 3,900 |
| 7/5/2017 | Lake Overton | 900 |
| 7/6/2017 | Hungary Creek | 1,500 |
| 7/28/2017 | Deep Run | 14,040 |
| 9/12/2017 | Trib. To Upham Brook | 2,584 |
| 11/1/2017 | Trib. To Deep Run | 750 |
| 12/9/2017 | Trib. To Unnamed Pond | 102 |
| 12/19/2017 | Trib. To Chickahominy River | 430 |
| 1/20/2018 | George's Branch | 1,350 |
| 1/22/2018 | Trib. To Deep Run | 1,500 |
| 2/13/2018 | Horse Swamp Creek | 1,670 |
| 2/20/2018 | Trib. To Tuckahoe Creek | 756 |
| 2/21/2018 | George's Branch | 810 |
| 3/21/2018 | Trib. To Meredith Branch | 1,200 |
| 3/29/2018 | Roundabout Creek | 1,800 |
| 4/10/2018 | Trib. To Deep Run | 410 |
| 4/12/2018 | Rocky Branch | 700 |
| 4/28/2018 | Trib. To Piney Run | 2,210 |
| 5/10/2018 | Unnamed Trib. To Cabin Branch | 375 |
| 5/17/2018 | Lake Overton | 14,100 |

| Date(s) | Receiving Stream | Volume Discharged (gallons) |
|---|---|---|
| 5/17/2018 | Tuckahoe Creek | 7,250,000 |
| 5/18/2018 | Upham Brook | 4,500 |
| 5/18/2018 | Trib. To North Run | 29,655 |
| 5/18/2018 | Gillies Creek | 832,700 |
| 5/18/2018 | Horse Swamp Creek | 95,000 |
| 5/18/2018 | Horse Swamp Creek | 2,700,000 |
| 5/18/2018 | Almond Creek | 664,000 |
| 5/18/2018 | Broadwater Creek | 830,000 |
| 5/19/2018 | Upham Brook | 22,140 |
| 6/2/2018 | Gillies Creek | 812,000 |
| 6/2/2018 | Tuckahoe Creek | 325,000 |
| 6/2/2018 | Horse Swamp Creek | 998,000 |
| 6/3/2018 | Horse Swamp Creek | 646,000 |
| 6/22/2018 | Broadwater Creek | 58,000 |
| 6/23/2018 | Broadwater Creek | 17,200 |
| 7/18/2018 | Almond Creek | 144,495 |
| 8/12/2018 | Tuckahoe Creek | 178,000 |
| 8/18/2018 | Almond Creek | 12,740 |
| 9/17/2018 | Upham Brook | 3,300 |
| 9/18/2018 | Upham Brook | 7,425 |
| 9/17/2018 | Lake Overton | 5,840 |
| 9/17/2018 | Upham Brook | 5,700 |
| 9/17/2018 | Trib. To North Run | 2,850 |
| 9/17/2018 | Tuckahoe Creek | 1,875,000 |
| 10/7/2018 | Westham Creek | 40,375 |
| 10/11/2018 | Almond Creek | 17,000 |
| 10/11/2018 | Tuckahoe Creek | 25,410,000 |
| 10/12/2018 | Gillies Creek | 191,250 |
| 10/11/2018 | Trib. To James River | 12,750 |
| 10/11/2018 | Trib. To James River | 2,550 |
| 10/11/2018 | Trib. To Stony Run | 5,100 |
| 10/12/2018 | North Run | 5,175 |
| 10/12/2018 | James River/Kanawha Canal | 10,500 |
| 10/12/2018 | Lake Overton | 1,325 |
| 10/24/2018 | Trib. to Little Westham Creek | 4,014 |
| 10/27/2018 | Lake Overton | 2,400 |
| 11/5/2018 | Lake Overton | 1,275 |
| 11/8/2018 | Upham Brook | 666 |
| 11/8/2018 | North Run | 2,700 |

| Date(s) | Receiving Stream | Volume Discharged (gallons) |
|---|---|---|
| 11/15/2018 | Gillies Creek | 96,000 |
| 11/15/2018 | Gillies Creek | 660,000 |
| 11/15/2018 | Almond Creek | 117,100 |
| 11/15/2018 | Lake Overton | 3,975 |
| 12/13/2018 | Upham Branch | 625 |
| 12/17/2018 | Deep Run | 118 |
| 12/19/2018 | James River/Kanawha Canal | 78,000 |
| 12/20/2018 | Trib. To Horse Swamp Creek | 1,600 |
| 12/5–20/2018; 12/28–29/2018 | Tuckahoe Creek | 4,782,900 |
| 1/14–15/2019 | Gillies Creek | 165,200 |
| 1/17/2019 | Upham Brook | 1,050 |
| 2/24/2019 | Tuckahoe Creek | 15,750 |
| 2/23–25/2019 | Lake Overton | 11,925 |
| 2/23–25/2019 | Gillies Creek | 122,234 |
| 2/26/2019 | Almond Creek | 36,400 |
| 3/1/2019 | Rocky Branch | 1,125 |
| 3/2/2019 | Trib. Of Allen's Branch | 1,560 |
| 3/4/2019 | Gillies Creek | 8,260 |
| 3/21–22/2019 | Tuckahoe Creek | 34,700 |
| 3/21–22/2019 | Almond Creek | 21,100 |
| 3/26/2019 | Almond Creek | 27,100 |
| 3/29–4/3/2019 | Tuckahoe Creek | 107,100 |
| 4/2/2019 | North Run | 2,805 |
| 4/8/2019 | Rocky Branch | 550 |
| 4/15/2019 | Tuckahoe Creek | 7,200 |
| 4/19/2019 | Upham Brook | 1,110 |
| 5/4/2019 | Kanawha Canal | 108,000 |
| 5/6/2019 | Upham Branch | 2,200 |
| 6/7–8/2019, 6/11/2019 | Almond Creek | 208,200 |
| 7/7–8/2019 | Almond Creek | 71,600 |
| 8/2/2019 | Trib. Of Piney Branch | 500 |
| 8/6/2019 | Upham Brook | 1,500 |
| 8/12/2019 | Trib. To Chickahominy River | 800 |
| 10/10/2019 | Deep Run | 390 |
| 10/29/2019 | Trib. To North Run | 843 |
| 11/19/2019 | Horsepen Branch | 600 |
| 12/4/2019 | Cornelius Creek | 83,000 |
| 12/4/2019 | Cornelius Creek | 20,265 |

| Date(s) | Receiving Stream | Volume Discharged (gallons) |
|---|---|---|
| 12/19/2019 | Trib. To Stony Run | 1,320 |
| 12/21–22/2019 | Almond Creek | 201,500 |
| 12/27/2019 | North Run | 3,050 |
| 1/14/2020 | Almond Creek | 36,800 |
| 1/14/2020 | Gillies Creek | 69,000 |
| 1/21/2020 | Almond Creek | 221,600 |
| 2/7/2020 | Gillies Creek | 225,100 |
| 2/12/2020 | Trib. To Stony Run | 8,400 |
| 2/23/2020 | Trib. To Stony Run | 1,470 |
| 3/2/2020 | Trib. To Chickahominy River | 24,500 |
| 3/16/2020 | North Run | 10,000 |
| 3/26/2020 | Hungary Creek | 450 |
| 4/30/2020 | Almond Creek | 32,230 |
| 4/30/2020 | Gillies Creek | 156,620 |
| 6/19/2020 | Chickahominy River | 3,000 |
| 7/27/2020 | Gillies Creek | 1,300 |
| 8/4/2020 | Almond Creek | 29,900 |
| 8/4/2020 | Broadwater Creek | 19,330 |
| 8/4/2020 | Gillies Creek | 103,500 |
| 8/4/2020 | Cornelius Creek | 13,900 |
| 8/4/2020 | Trib. To Oldhouse Branch | 1,100 |
| 8/4/2020 | Trib. To Oldhouse Branch | 150 |
| 8/5/2020 | Gillies Creek | 161,100 |
| 8/6/2020 | Gillies Creek | 101,200 |
| 8/9/2020 | Stony Run | 4,600 |
| 8/12/2020 | Gillies Creek | 28,120 |
| 8/14–16/2020 | Gillies Creek | 415,915 |
| 8/15–16/2020 | Almond Creek | 901,400 |
| 8/15–16/2020 | Broadwater Creek | 44,900 |
| 8/15/2020 | Unnamed Trib. To Gillies Creek | 910 |
| 8/16/2020 | Chickahominy River | 250 |
| 9/1–2/2020 | Gillies Creek | 96,200 |
| 9/18/2020 | Gillies Creek | 67,900 |
| 9/17–18/2020 | Almond Creek | 22,250 |
| 9/22/2020 | Unnamed Trib. To Tuckahoe Creek | 96 |
| 9/24/2020 | Unnamed Trib. To Gillies Creek | 492 |
| 10/11/2020 | Gillies Creek | 55,000 |
| 10/30/2020 | Gillies Creek | 39,200 |
| 11/12/2020 | Tuckahoe Creek | 37,000 |

| Date(s) | Receiving Stream | Volume Discharged (gallons) |
|---|---|---|
| 11/12/2020 | Almond Creek | 33,000 |
| 11/12–13/2020 | Gillies Creek | 125,000 |
| 12/5–6/2020 | Gillies Creek | 267,000 |
| 12/5/2020 | Tuckahoe Creek | 30,000 |
| 12/6/2020 | Unnamed Trib. To Horsepen Branch | 2,080 |
| 12/7/2020 | Unnamed Trib. To Flippen Creek | 425 |
| 12/14/2020 | Tuckahoe Creek | 34,000 |
| 12/15/2020 | Gillies Creek | 37,000 |
| 12/16–17/2020 | Rooty Branch | 378,000 |
| 12/16/2020 | Tuckahoe Creek | 23,000 |
| 12/16–17/2020 | Gillies Creek | 104,000 |
| 12/17/2020 | Meredith Branch | 157,000 |
| 12/25–26/2020 | Gillies Creek | 602,500 |
| 1/3–4/2021 | Gillies Creek | 75,700 |
| 1/11/2021 | Hungary Creek | 725 |
| 1/12–13/2021 | Little Westham Creek | 1,330 |
| 1/29/2021 | Unnamed Trib. To Trumpet Branch | 1,400 |
| 2/2/2021 | Little Westham Creek | 575 |
| 2/13–16/2021 | Gillies Creek | 313,000 |
| 2/16–17/2021 | Gillies Creek | 84,400 |
| 2/16/2021 | Tuckahoe Creek | 39,300 |
| 2/13/2021 | Almond Creek | 21,600 |
| 2/16/2021 | Almond Creek | 24,700 |
| 2/18–20/2020 | Gillies Creek | 260,061 |
| 2/18–19/2021 | Almond Creek | 32,000 |
| 2/19/2021 | Almond Creek | 39,500 |
| 2/22–23/2021 | Gillies Creek | 22,000 |
| 3/4/2021 | Beaverdam Creek | 850 |
| 3/24/2021 | Almond Creek | 14,200 |
| 4/30/2021 | Chickahominy River | 5,000 |
| 5/2/2021 | Chickahominy River | 250 |
| 6/11/2021 | Almond Creek | 8,640 |
| 6/11–12/2021 | Gillies Creek | 123,100 |
| 12/17/2020 | Meredith Branch | 157,000 |
| 12/25–26/2020 | Gillies Creek | 602,500 |
| 1/3–4/2021 | Gillies Creek | 75,700 |
| 1/11/2021 | Hungary Creek | 725 |
| 1/12–13/2021 | Little Westham Creek | 1,330 |
| 1/29/2021 | Unnamed Trib. To Trumpet Branch | 1,400 |

| Date(s) | Receiving Stream | Volume Discharged (gallons) |
|---|---|---|
| 2/2/2021 | Little Westham Creek | 575 |
| 2/13–16/2021 | Gillies Creek | 313,000 |
| 2/13–16/2021 | Gillies Creek | 313,000 |
| 2/16–17/2021 | Gillies Creek | 84,400 |
| 2/16/2021 | Tuckahoe Creek | 39,300 |
| 2/13/2021 | Almond Creek | 21,600 |
| 2/16/2021 | Almond Creek | 24,700 |
| 2/18–20/2020 | Gillies Creek | 260,061 |
| 2/18–19/2021 | Almond Creek | 32,000 |
| 2/19/2021 | Almond Creek | 39,500 |
| 2/22–23/2021 | Gillies Creek | 22,000 |
| 3/4/2021 | Beaverdam Creek | 850 |
| 3/24/2021 | Almond Creek | 14,200 |
| 4/30/2021 | Chickahominy River | 5,000 |
| 5/2/2021 | Chickahominy River | 250 |
| 6/11/2021 | Almond Creek | 8,640 |
| 6/11–12/2021 | Gillies Creek | 123,100 |
| 6/23–24/2021 | Westham Creek | 61,550 |
| 7/8/2021 | Almond Creek | 6,170 |
| 8/3/2021 | Trib. to Meredith Branch | 400 |
| 8/13/2021 | Gillies Creek | 353,000 |
| 8/15/2021 | Gillies Creek | 900 |
| 8/16/2021 | Stony Run | 77,000 |
| 9/16/2021 | Almond Creek | 11,723 |
| 9/16/2021 | Gillies Creek | 21,864 |
| 10/1/2021 | Chickahominy River | 3,000 |
| 10/3/2021 | Westham Creek | 1,000 |
| 10/7/2021 | Almond Creek | 4,940 |

**Count 5: Failure to Properly Operate and Maintain the Facility and Systems**

141.   Paragraphs 1 through 140 are incorporated herein by reference.

142.   The VPDES Permit requires Defendant to properly operate and maintain all facilities and systems of treatment and control installed or used to achieve compliance with conditions of the permit.

143.     Defendant has failed to satisfy the conditions of its VPDES permit by violating effluent limits and allowing, and failing to remedy, repeated unanticipated partial filter bypass and SSO events. The occurrence of these events demonstrates improper operation and maintenance of Defendant's Facility and systems of treatment and control.

144.     Defendant has failed to satisfy the conditions of its VPDES permit by allowing and failing to remedy its chronic effluent violations and frequent SSO events and unlawful unanticipated partial filter bypasses.

145.     Defendant's unpermitted SSO events negatively impact environmental justice communities in Henrico County. Through a lack of notification and meaningful efforts to resolve these ongoing issues, Defendant imposes a significant health risk to marginalized and vulnerable communities.

146.     Defendant is subject to civil penalties for each day of violation dating from the start of improper operation and maintenance.

147.     Upon information and belief, Plaintiffs allege that operation and maintenance violations are continuing and date back more than five (5) years, at least dating from 2016. This systemic failure is evidenced by chronic effluent violations and the near constant occurrence of SSO and unanticipated partial filter bypass events in that time frame.

148.     Henrico is subject to penalty of up to $56,460 for each day of violation of its VPDES Permit and the CWA for failure to properly operate and maintain all facilities of treatment and control.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A.      Declare that Defendant is in violation of its Permit and the CWA;

B.      Enjoin Defendant from further violating its Permit and the CWA;

C.      Order Defendant to assess and remediate the harm caused by its violations;

D.      Assess civil penalties against Defendant;

E.      Award Plaintiff the cost of litigation, including reasonable attorney's fees, costs, and expert fees and expenses, including future oversight costs;

F.      Retain jurisdiction to ensure compliance with the Court's decree; and

G.      Grant such other relief as this Court deems just and proper.

 Date: December 6, 2021.

/s/ Jon Mueller
Jon Mueller,
Vice President for Litigation -VA Bar No.: 21855
Taylor Lilley,
Environmental Justice Staff Attorney*
Chesapeake Bay Foundation, Inc.
6 Herndon Ave.
Annapolis, MD 21403
443-482-2162
Jmueller@cbf.org

*Counsel for Chesapeake Bay Foundation, Inc. and James River Association*

Jennifer Duggan, Deputy Director*
Environmental Integrity Project
1000 Vermont Avenue NW, Suite 1100
Washington, DC 20005
(802) 461-5309
jduggan@environmentalintegrityproject.org

*Counsel for James River Association*

*Admission for Pro Hac Vice Admission under Local Rule 83.1 pending.