IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

CHESAPEAKE BAY FOUNDATION, INC., *et al.*,
     Plaintiffs,

v.                                                                Civil No. 3:21cv752 (DJN)

COUNTY OF HENRICO,
     Defendant.

## MEMORANDUM OPINION

Plaintiffs Chesapeake Bay Foundation, Inc., and James River Association bring this citizen suit against Defendant County of Henrico, alleging violations of the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, at the Henrico County Water Reclamation Facility. This matter now comes before the Court on the Motion to Dismiss (ECF No. 12) filed by the County of Henrico.

For the reasons set forth below, the Court will GRANT IN PART and DENY IN PART Defendant's Motion.

## I.      BACKGROUND

A motion made pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges the court's jurisdiction over the subject matter of the complaint. A defendant moving for dismissal for lack of subject matter jurisdiction may either attack the complaint on its face, asserting that the complaint "fails to allege facts upon which subject matter jurisdiction can be based," or, may attack "the existence of subject matter jurisdiction in fact, quite apart from any pleadings." *White v. CMA Const. Co.*, 947 F. Supp. 231, 233 (E.D. Va. 1996) (internal citations omitted). When deciding a Rule 12(b)(1) motion to dismiss, a federal court may resolve factual questions to determine whether it has subject matter jurisdiction. *Thigpen v. United States*, 800 F.2d 393,

396 (4th Cir. 1986), *overruled on other grounds, Sheridan v. United States*, 487 U.S. 392 (1988).

In resolving a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court

will accept Plaintiff's well-pleaded factual allegations as true, though the Court need not accept

Plaintiff's legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Based on these

standards, the Court accepts the following facts.

### A.    Factual Background

Plaintiffs Chesapeake Bay Foundation, Inc. and James River Association bring this

citizen suit against Defendant County of Henrico, alleging significant and ongoing violations of

the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, (the "CWA" or "Act") at the Henrico County

Water Reclamation Facility (the "Facility"), including disregard for the terms of its Permit issued

under the Virginia Pollution Discharge Elimination System ("VPDES"). [1]  (Compl. ¶¶ 1-2 (ECF

No. 1).)  Henrico's violation of its Permit has harmed the ecological integrity of the James River

and its tributaries, and resulted in the Commonwealth of Virginia's imposition of four separate

consent orders in the last twenty-eight years.  (Compl. ¶¶ 5, 9-10.)  In light of violations in the

previous four years, and frustrated that the state's enforcement efforts have not resolved

Henrico's violations, Plaintiffs bring this citizen suit seeking Henrico's compliance with the

Clean Water Act.

---

[1]    The Chesapeake Bay Foundation and James River Associations are 501(c)(3) non-profit organizations oriented towards ecological restoration, education and advocacy.  Their members reside in the Commonwealth of Virginia along the James River basin downstream of the Facility and claim harm by the Facilities' violations.  Thus, they would have standing to sue in their own right.  (Compl. ¶¶ 20-22, 26, 28, 33.)

### 1.    Henrico's History of Non-compliance at the Facility

The Facility began operating in 1989, and receives untreated wastewater through its

sewage collection system from the greater Richmond area.  (Compl. ¶¶ 2-3.)  Henrico received

VPDES Permit No. VA0063690 (the "Permit") pursuant to the CWA, § 1342, authorizing the

Facility to discharge treated sewage and wastewater into the James River with certain limitations.

(Compl. ¶ 4.)  Specifically, the Permit establishes effluent load and concentration limits for,

among other things, Total Suspended Solids ("TSS")[2] and Carbonaceous Biological Oxygen

Demand ("CBOD")[3] and proscribes sanitary sewer overflows ("SSOs").[4]  (Compl. ¶ 4.)

Between August 3, 1989, and January 8, 1993, the Facility received twenty-three

Notices of Violation ("NOVs") that led to the development of a voluntary administrative consent

order (the "1993 Consent Order"), issued by the Commonwealth of Virginia State Water Control

Board, and approved by the Virginia Department of Environmental Quality ("DEQ") on June 1,

1993.  (Compl. ¶ 70; Exhibit D: 1993 Consent Order (ECF No. 1-5).)  That order directed

---

[2]     TSS refers to the amount of insoluble particles floating in suspension in wastewater.
(Compl. ¶ 6.)  TSS pollution significantly threatens waterways, and the aquatic organisms that
inhabit them, by inhibiting the growth of aquatic organisms by smothering them or blocking
sunlight.  (Compl. ¶ 6.)  Suspended solids can also carry bacteria and other toxic substances
threatening the health of impacted waterways and humans using those rivers, creeks and streams.
(Compl. ¶ 6.)

[3]     Elevated levels of TSS often translate to an increase in CBOD.  (Compl. ¶ 7.)  CBOD
refers to the consumption of dissolved oxygen by microorganisms when they convert organic
material into carbon dioxide via respiration.  (Compl. ¶ 7.)  Increased levels of CBOD
correspond to a decrease in the available oxygen in an affected waterbody, effectively
suffocating the aquatic organisms within it.  (Compl. ¶ 7.)

[4]     Illegal SSOs from the Facility also result in the discharge of raw sewage into the James
River and its tributaries.  (Compl. ¶ 8.)  Raw sewage risks exposure to an array of viruses,
bacteria and parasites.  (Compl. ¶ 8.)  The concentration of contaminants and the unpredictability
of the make-up of each SSO event presents a significant health risk to humans and impairs
waterways.  (Compl. ¶ 8.)

3

Henrico to implement a schedule of compliance addressing effluent limitations for fecal coliform and ammonia nitrogen through effluent filtration, ozone disinfection, and inflow and infiltration projects, but did not assess any penalty. (Compl. ¶¶ 70-71; Exhibit D: 1993 Consent Order at 1-3, App. A.)

In the period between February 5, 1993, and August 4, 1994, the Facility received thirteen NOVs. (Compl. ¶ 72; Exhibit E, at 1 (ECF No. 1-6).) During that time, the Facility failed to meet its Permit limits for TSS and CBOD and interim effluent limits set by the 1993 Consent Order for fecal coliform. (Compl. ¶ 72; Exhibit E: 1994 Consent Order Amendment at 1, App. A.) As a result, in September 1994, the State Water Control Board approved an amendment to the 1993 Consent Order, attributing these violations to a failure of the Facility's effluent filtration system and issuing an updated schedule of compliance. (Compl. ¶ 72.)

On February 19, 1998, DEQ issued an administrative consent order to Henrico to address SSO violations from Henrico's sewage collection system, requiring rehabilitation of nine sewer collection subsystems. (Compl. ¶ 73; Exhibit F: 2003 Consent Order, Section C ¶ 2 (ECF No. 1-7).) Henrico failed to meet the schedule identified in this order, resulting in DEQ's issuance of another NOV on November 23, 1999. (Compl. ¶ 73.)

On January 7, 2003, DEQ and Henrico entered into another administrative consent order (the "2003 Consent Order") to address consistent TSS, CBOD, total phosphorus, ammonia nitrogen, and chlorine effluent violations, as well as continued SSOs containing raw sewage that had occurred in the previous two years. (Compl. ¶ 75; Exhibit F: 2003 Consent Order, Section C ¶¶ 3-7.) On November 2, 2001, DEQ had issued an NOV to Henrico for violations of TSS and CBOD reported by Henrico during the March through August 2001 monitoring periods. (Compl. ¶ 74.) DEQ issued an additional NOV on April 16, 2002, for TSS, total phosphorous and

4

ammonia violations during the December 2001 through February 2002 monitoring periods. (Compl. ¶ 72.) The April NOV also cited Henrico for nineteen SSOs that occurred between September 1, 2001 and April 6, 2002. (Compl. ¶ 72.) Despite these NOVs, several additional sewage overflows followed. (Compl. ¶ 72; Exhibit F: 2003 Consent Order, Section C ¶¶ 3-4.) The 2003 Consent Order assessed a civil charge of $25,500 and required Henrico to develop and implement a formal operation and maintenance manual to address effluent limitation violations and submit a schedule of completion for several inflow and infiltration projects to be completed by January 15, 2007, to address the SSOs. (Compl. ¶ 76; Exhibit F: 2003 Consent Order, Section D, App. A.)

Henrico and DEQ amended the 2003 Consent Order in February 2005 to incorporate an additional inflow and infiltration project. (Compl. ¶ 77; Exhibit G: 2005 Consent Order Amendment, Section B ¶ 4 (ECF No. 1-8).) In September 2007, Henrico and DEQ again amended the 2003 Consent Order to confirm Henrico's completion of all of the corrective actions required to address the effluent violations identified and extend the schedule to complete the inflow and infiltration projects necessary to resolve the SSO violations. (Compl. ¶ 78; Exhibit H: 2007 Consent Order Amendment (ECF No. 1-9).)

Following a renewed series of SSO discharges and effluent limit violations by the Facility, DEQ and Henrico entered into yet another administrative consent order on December 17, 2010 (the "2010 Consent Order"). (Compl. ¶ 79.) The 2010 Consent Order limited its scope by dismissing the effluent violations and, instead, addressed twenty-six unauthorized SSOs occurring from June 20, 2009 through December 3, 2009, and fifty additional SSOs occurring from December 3, 2009 to June 11, 2010. (Compl. ¶ 79; Exhibit I: 2010 Consent Order ¶¶ C.2-7, 9, 10, 13-15 (ECF No. 1-10).) The 2010 Consent Order required Henrico to complete several

inflow and infiltration projects designed to eliminate ongoing illicit SSOs and instituted a Schedule of Compliance ending on June 15, 2018. (Compl. ¶ 80.) The 2010 Consent Order also required Henrico to submit to DEQ for approval, and then implement, standard operating procedures for the most optimal plant configuration and process modes for a given set of flow, temperature, and influent loading conditions. (Compl. ¶ 80.) Other than this requirement, the order did not include any other projects to remedy TSS and CBOD effluent violations from the Facility, as it claimed that the Facility had lost the necessary nitrification capability due to influent flow beyond its capacity. (Compl. ¶ 80.) The 2010 Consent Order required Henrico to pay a civil administrative penalty of $29,500 and did not include any stipulated penalty provisions for future violations. (Compl. ¶ 81.) However, as of February 22, 2021, public documents show no evidence of civil or administrative penalties assessed or paid since Henrico and DEQ's execution of the 2010 Consent Order. (Compl. ¶ 81.)

Henrico complied with its schedule and completed all of the projects listed in the 2010 Consent Order by April 2018. (Compl. ¶ 82; Def.'s Mem. Att. A: DEQ Enforcement Order 12/15/2021 ("2021 Consent Order") ¶ C.6 (ECF No. 13-1).) However, the projects failed to curb Henrico's frequent and recurring SSO events: since 2016, Henrico discharged over sixty-six million gallons of sewage into the James River and its tributary creeks and streams, with over fifty-six million gallons released after Henrico completed the projects required under the 2010 Consent Order. (Compl. ¶ 82; Exhibit J: Compilation of Henrico County, Unauthorized Discharge and Overflow Reports (Sept. 28, 2016 - Oct. 7, 2021) ("Henrico SSO Reports") (ECF No. 1-11).) Furthermore, Henrico again began to violate effluent limits in 2019. (Compl. ¶ 82.)

6

### 2. Recent Violations and Enforcement Actions

On May 31, 2017, DEQ renewed the Facility's VPDES Permit (Permit No. VA0063690). (Compl. ¶ 83.)  Although effective June 1, 2017, to May 31, 2020, DEQ administratively continued it.  (Compl. ¶ 83.)  The Permit acknowledges that the Facility has a design flow of seventy-five million gallons per day and, like the previous version, sets limitations for, among other things, TSS[5] and CBOD,[6] prohibits unanticipated bypass of wastewater,[7] requires "proper operation and maintenance of all facilities and systems of treatment and control" and imposes prompt reporting requirements to DEQ.  (Compl. ¶¶ 84, 86 (cleaned up).)

After renewal of the Permit in 2017, Henrico again received numerous NOVs and Warning Letters for effluent concentration and load limitation exceedances.  (Compl. ¶ 87.)  On May 7, 2019, DEQ issued a Warning Letter detailing exceedances for TSS concentration and load limits.  (Compl. ¶ 88; Exhibit K: DEQ, Henrico County Warning Letter (May 7, 2019) (ECF No. 1-12).)  On April 3, 2020, DEQ sent Henrico an NOV reiterating previously identified violations that occurred in February 2020 relating to the TSS concentration and load limits.  (Compl. ¶ 89; Exhibit L: DEQ, Henrico County Notice of Violation (Apr. 3, 2020) ("April 3, 2020 NOV") (ECF No. 1-13).)  On June 3, 2020, Henrico received an NOV from DEQ

---

[5]     The Permit limits TSS discharge as follows:  monthly average concentration 8.0 milligrams per liter ("mg/L"), monthly average load 2,300 kilograms per day ("kg/day"), weekly average concentration 12.0 mg/L, weekly average load 3,400 kg/day.  (Compl. ¶ 84.)

[6]     The Permit limits CBOD discharge as follows:  June 1 - October 31, monthly average concentration 5.0 mg/L, monthly average load 1,361 kg/day, weekly average concentration 7.0 mg/L, weekly average load 2,044 kg/day; November 1 - May 31, monthly average concentration 8.0 mg/L, monthly average load 2,157 kg/day, weekly average concentration 11.0 mg/L, weekly average load 3,236 kg/day.  (Compl. ¶ 84.)

[7]     The 2017 Permit defines a "bypass" as the "intentional diversion of water streams from any portion of a treatment facility."  (Compl. ¶ 99.)

7

detailing March 2020 and April 2020 violations, again pertaining to TSS concentration and load limits, as well as CBOD concentrations and load limits. (Compl. ¶ 90; Exhibit M: DEQ, Henrico County Notice of Violation (June 3, 2020) (ECF No. 1-14).) On August 11, 2020, DEQ issued another NOV for May 2020 and June 2020 effluent violations for TSS concentration and load limit exceedances. (Compl. ¶ 91; Exhibit N: DEQ, Henrico County Notice of Violation (Aug. 11, 2020) (ECF No. 1-15).)

Henrico has also reported several recent SSOs at the Facility. Following a July 18, 2018 SSO event lasting 585 minutes and releasing 144,495 gallons of sewage into Almond Creek, a James River tributary, a DEQ site inspector "observed evidence of long-term overflow of sewage at the location based on excessive bacterial growth on the stream bottom as well as the existence of aged sewage solids." (Compl. ¶ 92; Exhibit O: DEQ, Henrico County Notice of Violation (Sept. 18, 2018) ("Sept. 18, 2018 NOV") at 2 (ECF No. 1-16).) On September 18, 2018, DEQ issued an NOV for fifty-nine individual SSO events that occurred between September 28, 2016, and August 18, 2018. (Compl. ¶ 93; Sept. 18, 2018 NOV at 1-3; *see also* Table 10, Compl. at 34-40.) On February 21, 2019, DEQ issued another NOV for twenty-nine additional unpermitted SSOs from the Facility's collection system, occurring between September 17, 2018, and January 15, 2019. (Compl. ¶ 94; Exhibit P: DEQ, Henrico County Notice of Violation (Feb. 21, 2019) (ECF No. 1-17); *see also* Table 10.) On April 18, 2019, DEQ again issued an NOV for thirteen additional unpermitted SSOs occurring between January 17, 2019, and April 15, 2019. (Compl. ¶ 95; Exhibit Q: DEQ, Henrico County Notice of Violation (Apr. 18, 2019) (ECF No. 1-19); *see also* Table 10.) On August 15, 2019, DEQ issued an NOV for five unpermitted SSOs occurring between April 19, 2019, and July 8, 2019. (Compl. ¶ 96; Exhibit R: DEQ, Henrico County Notice of Violation (Aug. 15, 2019); *see also* Table 10.) Since September 2019, Henrico has

8

reported several additional SSO events which account for millions of gallons of illicit sewage discharged.  (Compl. ¶ 97; Exhibit J: Henrico SSO Reports; *see also* Table 10.)

In addition to violations noticed by DEQ, Henrico, in compliance with reporting requirements of its Permit, has also identified and reported recurring unanticipated filter bypass events.  (Compl. ¶ 98.)  The Permit prohibits bypasses unless unavoidable to prevent loss of life, injury, or severe property loss and there existed no feasible alternatives to the bypass.  (Compl. ¶ 100.)  Henrico's written reports notifying DEQ of these bypasses provide no indication that these conditions were satisfied, instead variously attributing unanticipated partial bypass events to out-of-service filter cells,[8] a combination of increased pollutant loads and the failure of three primary clarifiers[9] and equipment failure.[10]  (Compl. ¶¶ 100-03.)[11]

### 3.  2021 Proposed Administrative Consent Order

In response to Henrico's recent NOVs, DEQ required that Henrico attend an enforcement conference on June 24, 2020 to discuss the violations.  (2021 Consent Order ¶ C.20.)  On August 26, 2020, DEQ sent Henrico a draft administrative consent order imposing a civil charge of $65,835 and requiring Henrico to submit a proposed Corrective Action Plan and implementation

---

[8]     Ten individual SSO events occurred during the period of time spanning February 11-28, 2021.  (Compl. ¶ 101; Exhibit S: Compilation of 2021 Partial Filter Bypass Notifications and Written Reports (Feb. 11, 2021-Mar.6, 2021) ("Bypass Reports") (ECF No. 1-20).)

[9]     Three individual SSO events occurred during the period of time spanning March 1-6, 2021.  (Compl. ¶ 102; Bypass Reports.)

[10]     Sixteen individual SSO events occurred during the period of time spanning March 24 to June 15, 2021.  (Compl. ¶ 103; Bypass Reports.)

[11]     Three additional unapproved bypass events occurred on September 16, October 3 and 7, 2021.  (Compl. ¶ 104.)

schedule for review and approval by DEQ. (Decl. of Bentley P. Chan, P.E.[12] ("Chan Decl.") ¶¶ 13-14 (ECF No. 13-3).) DEQ gave Henrico until September 8, 2020 to provide comments on the draft order. (Chan Decl. ¶ 14.) After a year of negotiating the terms, Henrico signed the 2021 Consent Order on August 25, 2021. (Compl. ¶¶ 105-06; 2021 Consent Order at 13.) The 2021 Consent Order assessed an administrative penalty of $207,680, requiring Henrico to pay $51,920 in administrative penalties and allowing Henrico to conduct a Supplemental Environmental Project to satisfy the rest of the $155,750 assessed, and does not propose any stipulated penalties for future violations. (Compl. ¶ 106.) It aims to resolve effluent limit exceedances and partial filter bypass event violations from the Facility by requiring replacement of existing equipment. (Compl. ¶ 106.) On September 16, 2021, DEQ published the Proposed Administrative Consent Order for notice and comment as required by Virginia Code § 62.1-44.15(8f). (Compl. ¶ 105.) Plaintiffs took the opportunity to raise their concerns during notice and comment. (Enforcement Summary at 3-10; DEQ Hr'g Tr. (Dec. 14, 2021) ("Hr'g Tr.") at 113-20 (ECF No. 16-1).) The DEQ board considered those comments, responded to them in full in a published statement, provided additional response during its December 14, 2021 board meeting and ultimately executed the 2021 Consent Order without incorporating any comments. (Enforcement Summary at 3-10; Hr'g Tr. at 113-25.)

Just two weeks before Henrico's execution of the 2021 Consent Order, on August 11, 2021, Plaintiffs transmitted to Defendant their Notice of Intent to Sue (the "NOI") as required by 33 U.S.C. § 1365(b)(1)(A). (Compl. ¶ 12; NOI Letter (ECF No. 1-3).) On December 6, 2021, before DEQ finalized the 2021 Consent Order, Plaintiffs filed this suit. (Compl. ¶ 105.) After a

---

[12] Mr. Chan, a licensed Professional Engineer, serves as Director of Henrico County Department of Public Utilities ("DPU"). (Chan Decl. ¶¶ 2-3.)

hearing on December 14, 2021, DEQ executed the final 2021 Consent Order on December 15, 2021. (2021 Consent Order at 12-13.)

### B.     Plaintiffs' Complaint

On December 6, 2021, Plaintiffs filed their Complaint against Defendant, raising five counts for relief based on the above allegations.  Plaintiffs raise each of the counts for a distinct manner in which Henrico contravened the terms of its VPDES Permit, in violation of sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342.  Count One asserts a claim for violations of effluent load limitations of the Permit, alleging that Henrico exceeded its weekly and monthly average effluent load limit for TSS and CBOD on several occasions in the past three years. (Compl. ¶¶ 109-19.)  Count Two asserts a claim for violations of effluent concentration limitations of the Permit, alleging that Henrico also exceeded its weekly and monthly average effluent concentration limit for TSS and CBOD on several occasions in the past three years. (Compl. ¶¶ 120-26.)  Count Three asserts a claim for violations of the prohibition on unanticipated filter bypasses under the Permit, alleging thirty violations since the beginning of 2021. (Compl. ¶¶ 127-30.)  Count Four asserts a claim for unpermitted SSO events under the Permit, alleging that Henrico has discharged 65,881,966 gallons of raw, untreated sewage into the James River and its tributaries since September 2016. (Compl. ¶¶ 131-40.)  Count Five asserts a claim for failure to properly operate and maintain the Facility and systems under the Permit, founded on the Permit violations described in Counts One through Four. (Compl. ¶¶ 141-48.)  Based on these claims, Plaintiffs seek declaratory and injunctive relief ordering Henrico to cease violating its Permit and the Clean Water Act, as well as to assess and remediate the harm caused, as overseen by the Court. (Compl. at 41-42.)  Plaintiffs also seek the

imposition of civil penalties and the award of reasonable attorney's fees and costs.  (Compl. at 41-42.)

## C.     Defendant's Motion

In response to Plaintiffs' Complaint, on January 6, 2022, Defendant filed a Motion to Dismiss (ECF No. 12), moving to dismiss Plaintiffs' claims against it for lack of subject matter jurisdiction and failure to state a claim under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  In support of its Motion, Henrico argues that 33 U.S.C. § 1319(g)(6) bars this citizen suit in its entirety, because DEQ has already commenced and was diligently prosecuting its enforcement action against Henrico at the time that Plaintiffs filed their Complaint.  (Mem. in Supp. of its Mot. to Dismiss for Lack of Subject Matter Jurisdiction and for Failure to State a Claim Upon Which Relief can be Granted ("Def.'s Mem.") at 5-14 (ECF No. 13).)  Additionally, Henrico argues that Counts One and Two fail to state a claim, and the Court lacks subject matter jurisdiction over them, because they rely on wholly past violations that Henrico has already remedied.  (Def.'s Mem. at 14-16.)

On January 20, 2022, Plaintiffs filed their response in opposition (Pls.' Br. in Opp'n to Def.'s Mot. to Dismiss ("Pls.' Resp.") (ECF No. 16)), to which Henrico replied on January 26, 2022 (Reply Br. in Supp. of its Mot. to Dismiss for Lack of Subject Matter Jurisdiction and for Failure to State a Claim Upon Which Relief can be Granted ("Def.'s Reply") (ECF No. 17)), rendering the Motion now ripe for review.

## II.     STANDARD OF REVIEW

A motion made pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges the court's jurisdiction over the subject matter of the complaint.  A defendant moving for dismissal for lack of subject matter jurisdiction may either attack the complaint on its face, asserting that

the complaint "fails to allege facts upon which subject matter jurisdiction can be based," or may attack "the existence of subject matter jurisdiction in fact, quite apart from any pleadings." *White*, 947 F. Supp. at 233 (internal citations omitted). In either case, the plaintiff bears the burden of proof to establish jurisdiction. *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). The Court must dismiss an action if it determines that it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3).[13]

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint or counterclaim; it does not serve as the means by which a court will resolve contests surrounding the facts, determine the merits of a claim or address potential defenses. *Republican Party of N. Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a motion to dismiss, the Court will accept a plaintiff's well-pleaded allegations as true and view the facts in a light most favorable to the plaintiff. *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

---

[13]    Henrico attaches to its Memorandum in Support of its Motion to Dismiss the fully executed 2021 Consent Order, the Enforcement Summary and the Chan Declaration. When a defendant makes a facial challenge to subject matter jurisdiction under Rule 12(b)(1), a court will treat the motion similar to one made for failure to state a claim under Rule 12(b)(6) and take only the facts alleged in the complaint as true. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). But when a defendant challenges the factual allegations that a Plaintiffs makes in support of subject matter jurisdiction, a court can resolve factual disputes to decide whether it has subject matter jurisdiction. *Thigpen*, 800 F.2d at 396. By that token, a court "may consider affidavits, depositions, or live testimony without converting [a Rule 12(b)(1) Motion] into one for summary judgment." *Lewis v. UPS Freight*, 2010 WL 1640270, at *1 (E.D. Va. Apr. 22, 2010) (citing *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995)); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). It appears that Henrico raises a factual dispute regarding the full extent of DEQ's enforcement actions. (Def.'s Mem. *passim*.) For that reason, the Court will take into consideration the attachments to the Memorandum to the extent that they go to the factual dispute.

Under the Federal Rules of Civil Procedure, a complaint or counterclaim must state facts sufficient to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). As the Supreme Court opined in *Twombly*, a complaint or counterclaim must state "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action," though the law does not require "detailed factual allegations." *Id.* (citations omitted). Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," rendering the right "plausible on its face" rather than merely "conceivable." *Id.* at 555, 570. Thus, a complaint must assert more facts than those "merely consistent with" the other party's liability. *Id.* at 557. And the facts alleged must suffice to "state all the elements of [any] claim[s]." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) and *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).

## III.   DISCUSSION

### A.   The Diligent Prosecution Bar to Citizen Suits Under the Clean Water Act

Henrico first moves to dismiss Plaintiffs' Complaint for lack of subject matter jurisdiction due to the diligent prosecution bar of 33 U.S.C. § 1319(g)(6). "Congress enacted the [Clean Water Act] 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" *The Piney Run Pres. Ass'n v. The Cty. Comm'rs Of Carroll Cty., MD*, 523 F.3d 453, 455 (4th Cir. 2008) (quoting 33 U.S.C. § 1251). "To serve those ends, the Act prohibits 'the discharge of any pollutant by any person' unless done in compliance with some provision of the Act." *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians,* 541 U.S. 95, 102 (2004) (quoting 33 U.S.C. § 1311(a)). Section 402 of the Act, codified at 33 U.S.C. § 1342,

14

"established a National Pollution Discharge Elimination System (NPDES) that is designed to prevent harmful discharges into the Nation's waters." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife,* 551 U.S. 644, 650 (2007). "Generally speaking, the NPDES requires dischargers to obtain permits that place limits on the type and quantity of pollutants that can be released into the Nation's waters." *Miccosukee Tribe,* 541 U.S. at 102. An NPDES permit "defines, and facilitates compliance with, and enforcement of, a preponderance of a discharger's obligations under the [Act]." *Env't Prot. Agency v. California ex rel. State Water Res. Control Bd.,* 426 U.S. 200, 205 (1976). "The Environmental Protection Agency (EPA) initially administers the NPDES permitting system for each State, but a State may apply for a transfer of permitting authority to state officials. . . . albeit with continuing EPA oversight." *Nat'l Ass'n of Home Builders,* 551 U.S. at 650 (cleaned up). In 1975, the EPA delegated Clean Water Act enforcement to the Commonwealth of Virginia, which administers its Virginia Pollution Discharge Elimination System ("VPDES") through its Department of Environmental Quality. *Historic Green Springs, Inc. v. U.S. E.P.A.,* 742 F. Supp. 2d 837, 842 (W.D. Va. 2010); 9 Va. Admin. Code § 25-31-10 *et seq.*

"Although the primary responsibility for enforcement rests with the state and federal governments, private citizens provide a second level of enforcement and can serve as a check to ensure the state and federal governments are diligent in prosecuting Clean Water Act violations." *Sierra Club v. Hamilton Cty. Bd. of Cty. Comm'rs*, 504 F.3d 634, 637 (6th Cir. 2007). Specifically, section 505(a) of the Act, 33 U.S.C. § 1365(a), authorizes citizens "to bring suit against any NPDES permit holder who has allegedly violated its permit." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 152 (4th Cir. 2000) (en banc). The Fourth Circuit has recognized that this citizen suit provision is "critical to the enforcement of the

Clean Water Act," *id.*, as it allows citizens "to abate pollution when the government cannot or will not command compliance," *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 62 (1987).

However, citizen suits are meant "to supplement rather than to supplant governmental action," *id.* at 60, and, as relevant here, the Act expressly bars such suits where the State has issued a "final order not subject to further judicial review" or has at least "commenced and is diligently prosecuting" an administrative enforcement action[14] against the defendant under State law comparable to the Act's administrative enforcement scheme.[15] 33 U.S.C. § 1319(g)(6)(A)(ii)-(iii). The Clean Water Act creates an exception for citizen suits in which the Plaintiffs either (i) filed a civil action prior to the State commencing its enforcement action, or (ii) provided notice of its intent to sue prior to the State commencing its enforcement action and actually filed suit within 120 days of that notice. § 1319(g)(6)(B)(i)-(ii).

Here, the parties agree to the underlying timeline of events, but dispute (1) the scope of the diligent prosecution bar, (2) which of those events constitute the commencement of DEQ's prosecution, and (3) whether DEQ diligently prosecuted its enforcement action. Between September 18, 2018 and June 3, 2020, DEQ issued six NOVs citing Henrico for various violations of its VPDES permit. (2021 Consent Order ¶¶ C.9-18.) As described in DEQ's Civil

---

[14]     The Act also includes a separate diligent prosecution bar that applies when the State has pursued enforcement in a court instead of administratively. 33 U.S.C. § 1365(b) ("No action may be commenced . . . if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any citizen may intervene as a matter of right.").

[15]     Here, Plaintiffs do not dispute Defendant's assertion of comparability of the enforcement authorities and procedures of the State Water Control Law, Va. Code § 62.1-44.2 *et seq.* to those of the Clean Water Act. (Mot. at 2; Def.'s Mem. at 6.)

Enforcement Manual, an NOV "is considered the referral from [the] compliance [Division] to [the Division] of Enforcement." (*DEQ Civil Enforcement Manual, Chapter 2 – General Enforcement Procedures*, VA. DEP'T OF ENV'T QUALITY 4 (Dec. 31, 2021)[16].)  On June 24, 2020, acting upon the referrals, "[DEQ] held an enforcement conference [with Henrico] on the phone to discuss the violations.  During the meeting, Henrico stated that they have recognized the need for final filter rehabilitation at the treatment plant and have initiated both an interim and a long term corrective action plan." (2021 Consent Order ¶ C.20.)

On August 26, 2020, DEQ sent Henrico a draft enforcement order imposing a civil charge of $65,835 and requiring Henrico to submit a proposed Corrective Action Plan and implementation schedule for review and approval by DEQ.  (Chan Decl.  ¶¶ 13-14.)  DEQ gave Henrico until September 8, 2020, to provide comments on the draft order.  (Chan Decl. ¶ 14.)  "Over the ensuing 12 months, DEQ's enforcement staff engaged [Henrico] in its prosecution of this enforcement action including working to significantly expand the enforcement action's scope and requirements." (Chan Decl. ¶ 15.)  On August 25, 2021, Henrico signed the proposed consent order, rendering it ripe for public comment as required by Virginia Code § 62.1-44.15(8f).  (2021 Consent Order at 13; DEQ Enforcement Item Summary, State Water Control Board Meeting Dec. 14, 2021 ("Enforcement Summary") at 2 (ECF No. 13-2).)  Public comment on the proposed Consent Order proceeded from September 13, 2021 to October 13, 2021. (Enforcement Summary at 2.)  After a hearing on December 14, 2021, DEQ executed the final Consent Order on December 15, 2021.  (2021 Consent Order at 11-12.)

---

[16]     Available at https://townhall.virginia.gov/L/GetFile.cfm?File=C:\TownHall\docroot\GuidanceDocs\440\GDoc_DEQ_4432_v7.pdf.

On August 11, 2021, two weeks before Henrico's execution of the Consent Order, Plaintiffs transmitted to Henrico their Notice of Intent to Sue as required by 33 U.S.C. § 1365(b)(1)(A).  (Compl. ¶ 12.)  On December 6, 2021, Plaintiffs filed this suit.

### 1.    Scope of Preclusion

First, the parties contest whether the diligent prosecution bar operates to preclude only civil penalty actions, or also bars actions seeking injunctive or declaratory relief.  By its terms, § 1319(g)(6)(A) states, in relevant part, that "any violation . . . with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection . . . shall not be the subject of a *civil penalty action* under subsection (d) of this section or section 1321(b) of this title or section 1365 [the citizen suit provision] of this title."  In light of the plain language of this provision, the Court preliminarily concludes that, should the diligent prosecution bar apply here, it would only preclude Plaintiffs' claims for civil penalties.  As Plaintiffs seek injunctive relief as well, those claims may proceed unimpeded by § 1319(g)(6)(A).

While the Fourth Circuit has not yet ruled on the scope of the diligent prosecution bar, Defendant cites to cases from the First and Eighth Circuit Court of Appeals that have found the bar to encompass both legal and equitable relief.  In *N. & S. Rivers Watershed Ass'n, Inc. v. Town of Scituate*, the First Circuit reasoned that, in spite of the plain language of the statute, "it is inconceivable" and not only "undesirable" but "absurd" that the § 1319(g)(6) bar would apply to civil penalty actions but not declaratory and injunctive relief.  949 F.2d 552, 557-58 (1st Cir. 1991).  The Eighth Circuit similarly disregarded the statute's plain language in *Arkansas Wildlife Fed'n v. ICI Americas, Inc.*, concluding that "such a result would undermine . . . the goals of the [Clean Water Act], and . . . the intent of Congress."  29 F.3d 376, 383 (8th Cir. 1994).  Both

cases relied on the Supreme Court's reasoning in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, that § 1365(a) "does not authorize civil penalties separately from injunctive relief; rather, the two forms of relief are referred to in the same subsection, even in the same sentence." 484 U.S. 49, 58 (1987).

In contrast, the Tenth Circuit, in *Paper, Allied-Indus., Chem. And Energy Workers Int'l Union v. Cont'l Carbon Co.*, has more recently applied the plain language of the statue and allowed claims for equitable relief to proceed where the diligent prosecution bar precluded claims for legal relief. 428 F.3d 1285, 1300 (10th Cir. 2005). There, the Tenth Circuit distinguished *Gwaltney*, noting that the Supreme Court faced the question of whether a citizen suit could seek civil penalties for wholly past violations of the Act and held "that a civil penalty may only be sought when the citizen is also seeking injunctive relief." *Id.* at 1299. Like in *Paper*, "[t]he issue before us is instead the mirror image of the Supreme Court's holding: whether a suit seeking injunctive relief can be maintained when the Plaintiffs cannot seek civil penalties." *Id.*

Persuaded by the Tenth Circuit's reasoning, the Court finds that no basis exists to depart from the plain language of the diligent prosecution bar.[17] Principally, the Court notes that, in contrast to broadly authorizing "civil action" citizen suits in § 1365, Congress chose to use the narrower term "civil penalty action" in § 1319 describing those actions preluded by the state's diligent prosecution. This Court must "give effect to Congress' choice" to include the narrower

---

[17]     In matters of statutory interpretation, the Fourth Circuit has adopted the judicial canon of the "plain meaning rule:" without some ambiguity present in the statute's language, "a court's analysis must end with the statute's plain language." *Hillman v. I.R.S.*, 263 F.3d 338, 342 (4th Cir. 2001) (citation omitted). Rare exceptions to the rule exist where its application would produce an outcome that either "is demonstrably at odds with clearly expressed congressional intent to the contrary" or "results in an outcome that can truly be characterized as absurd . . . shock[ing to] general moral or common sense." *Id.* (citation omitted).

term in § 1319. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 354 (2013); *United States v. Menasche*, 348 U.S. 528, 538-39 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute, rather than to emasculate an entire section.") (cleaned up). Further, the language of § 1365 maintains a distinction between legal and equitable relief, allowing for "enforcement" of effluent standards or limitations separately from "apply[ing] any appropriate civil penalties."

Additionally, alongside the diligent prosecution bar, the statute includes a separate jurisdiction-stripping provision for claims for injunctive relief in § 1365(b)(1)(B), which applies when the state initiates judicial proceedings against a polluter. Resultantly, Congress has created a "two-tiered claim preclusion scheme:" a private citizen may not sue at all if the state diligently prosecutes a court action to enforce the standard, but if the state diligently prosecutes administrative enforcement, a private citizen may still seek injunctive relief. *Paper*, 428 F.3d at 1298. Beyond the plain language of the statute, Congress' intent for § 1319 to only preclude civil penalty actions finds support in the legislative history. *Id.* at 1299-1300 (quoting H.R. Conf. Rep. No. 1004, 99th Cong., 2d Sess. at 133 (1986) (the § 1319 diligent prosecution bar "would not apply to: 1) an action seeking relief other than civil penalties (e.g., an injunction or declaratory judgment) . . .")) Finally, as "[t]he governing principle behind § 1319(g) is to avoid duplicative monetary penalties for the same violation," allowing claims for equitable remedies to proceed does not amount to an absurd result as "the court can manage the actions to ensure that the state action will predominate." *Id.* at 1300.

Because allowing Plaintiffs' claims for equitable relief to proceed does not contravene Congressional intent or lead to an absurd result, the Court declines to follow the reasoning of the

First and Eighth Circuits in setting aside the plain language of the statute.[18]  Accordingly, the

Court concludes that the diligent prosecution bar of § 1319(g)(6) applies, if at all, only to

Plaintiffs' claims for civil penalties.  The Court's holding on scope finds support with district

courts in this circuit and beyond.  *See United States v. Smithfield Foods, Inc.*, 965 F. Supp. 769,

791 (E.D. Va. 1997), *aff'd in part, rev'd in part,* 191 F.3d 516 (4th Cir. 1999) ("Since Section

309(g)(6)(A) only applies to civil penalty actions, the court finds that the United States' claim for

injunctive relief is not barred by this section."); *Coal. for a Liveable W. Side, Inc. v. New York

City Dep't of Env't Prot.*, 830 F. Supp. 194, 197 (S.D.N.Y. 1993) ("The express words of

§ 1319(g)(6)'s bar provision appear to have been chosen with care.  I can find no reason to

abrogate them."); *Sierra Club v. Hyundai Am., Inc.*, 23 F. Supp. 2d 1177, 1180 (D. Or. 1997) ("It

would require a significant departure from the plain meaning of the statute to find plaintiffs' case

for injunctive or declaratory relief barred by section 1319(g)(6)(A).").  *But see Naturaland Tr. v.

Dakota Fin., LLC*, 531 F. Supp. 3d 953, 964 n.12 (D.S.C. 2021) ("This Court agrees with the

First circuit [sic] and concludes 1319 [sic] applies to all civil actions.").  Accordingly, to the

extent that the diligent prosecution bar applies at all, it would only apply to bar Plaintiffs' claims

for civil penalties.

### 2.    Commencement of an Enforcement Action

To avoid the jurisdictional bar of 33 U.S.C. § 1319(g)(6)(A), the statute requires, *inter

alia*, that Plaintiffs establish that they gave their August 11, 2021 Notice of Intent to Sue "prior

---

[18]     Additionally, the Court notes that the First Circuit appears to presently be reconsidering its interpretation of the scope of the diligent prosecution bar.  Thirty years after deciding *Scituate*, the court has granted rehearing *en banc* in *Blackstone Headwaters Coal., Inc. v. Gallo Builders, Inc.*, "as to the issue of whether to overrule the holding in [*Scituate*] that citizen suits seeking equitable relief under 33 U.S.C. § 1319 are not permitted when a state has commenced and is diligently prosecuting an action under a state law comparable to § 1319(g)." 15 F.4th 1179 (1st Cir. 2021).

to commencement" of DEQ's enforcement action. Henrico moves to dismiss Plaintiffs' suit, arguing that DEQ had commenced its prosecution of the enforcement action "at least as of June [24,] 2020," when it conducted an enforcement conference with Henrico. (Def.'s Mem. at 6-8.) Because that date precedes Plaintiffs' August 11, 2021 NOI by over one year, deeming enforcement to have commenced then would bar this citizen suit's claims for civil penalties under 33 U.S.C. § 1319(g)(6)(B)(ii). Plaintiffs contend that commencement did not occur until September 13, 2021, when DEQ released the proposed 2021 Consent Order for notice and comment. (Pls.' Resp. at 12-13). Should the Court find commencement to have occurred then, the suit could go forward in its entirety, because Plaintiffs sent their NOI one month before public comment began. The Fourth Circuit has not addressed when a Clean Water Act administrative enforcement action commences. District courts that have addressed the issue do not coalesce around any specific administrative action, but make their determination based upon the facts of the case.

Here, the Court finds that DEQ commenced its administrative enforcement action before Plaintiffs sent their NOI. It appears to the Court that, in these circumstances, DEQ's NOVs issued to Henrico between September 2018 and June 2020 did not constitute commencement. In some regards, these letters resemble commencement of administrative enforcement, because they recite specific factual bases supporting the violation, provide citation to the relevant code sections contravened and those sections providing authority for DEQ enforcement, notify Henrico of maximum potential penalties and describe follow-on procedures for resolution of the violation. *See Pub. Int. Rsch. Grp. of New Jersey, Inc. v. Elf Atochem N. Am., Inc.*, 817 F. Supp. 1164, 1173 (D.N.J. 1993) (finding notice commenced proceeding where it provided due process protections such as specification of amount of penalty to be imposed or advice of right to

hearing); *cf. Pub. Int. Rsch. Grp. of New Jersey, Inc. v. New Jersey Expressway Auth.*, 822 F. Supp. 174, 184 n.13 (D.N.J. 1992) (finding no commencement of proceeding where agency correspondence with defendant did not provide due process protections such as specification of amount of penalty to be imposed or advice of right to hearing).

However, in spite of these hallmarks of commencing an enforcement action, the fact that the NOVs used conditional language describing possible future enforcement actions and that DEQ issued six NOVs serially over a period of almost two years — without pursuing resolution through a consent order or adversarial action — persuade the Court that the NOVs alone did not amount to commencement. *See Elf Atochem N. Am., Inc.*, 817 F. Supp. at 1173 (finding inspection reports did not commence proceeding where they were "simply one in a series of periodic reports . . . which served to warn defendant than an enforcement action might be initiated in the future"); *cf. Sierra Club v. Colorado Ref. Co.*, 852 F. Supp. 1476, 1485 (D. Colo. 1994) (finding notice of violation commenced proceeding where it was "not one of a periodic series" and, rather than describe future enforcement conditionally, "demanded submission of a specific correction plan 'before we pursue *further* action'"). Because the conditional language in the NOVs regarding enforcement outweigh the due process protections, the Court finds that the NOVs did not commence enforcement. (*See, e.g.*, April 3, 2020 NOV at 4-5 ("In order to avoid adversarial enforcement proceedings, Henrico County *may* be asked to enter into a Consent Order with the Department . . .") (emphasis added).)

In contrast, the Court finds that the June 24, 2020 Enforcement Conference supplements the NOVs to create the hallmarks of commencement that the NOVs lacked on their own. While the NOVs served as referrals from DEQ's Compliance Division to DEQ's Enforcement Division, the Enforcement Conference represented DEQ's engagement with Henrico to bring the Facility

into compliance and assess appropriate civil penalties. *Cf. Naturaland Tr. v. Dakota Fin., LLC*, 531 F. Supp. 3d 953, 958, 961 (D.S.C. 2021) (finding notice of alleged violation commenced enforcement where it included notice of enforcement conference). During the Enforcement Conference, having already informed Henrico of its due process protections in its most recent NOV three weeks before, DEQ obtained Henrico's admission of needed corrective actions and determined that the most appropriate course of action would be an expedited resolution through Consent Order. *Elf Atochem N. Am., Inc.*, 817 F. Supp. at 1173 (finding provision of due process protections critical to commencement). In follow-up, on August 26, 2020, DEQ delivered a draft consent enforcement order to Henrico, which assessed a civil penalty of $65,835. *See Molokai Chamber of Com. v. Kukui (Molokai), Inc.*, 891 F. Supp. 1389, 1405 (D. Haw. 1995) ("[T]he State must seek penalties and not merely compliance in order for its action to have a preclusive effect."). DEQ also required Henrico to respond by September 8, 2020, and submit a proposed Corrective Action Plan and implementation schedule. *See Colorado Ref. Co.*, 852 F. Supp. at 1485 (finding notice of violation commenced proceeding where it demanded submission of a specific correction plan); *cf. Gulf Restoration Network v. Hancock Cty. Dev., LLC*, 2009 WL 3841728, at *5 (S.D. Miss. Nov. 16, 2009) (finding notice of violation did not commence enforcement where it merely requested information in furtherance of resolving the violation). The following year saw the negotiation of the terms of the Consent Order, including the increase of the civil penalty to $207,680 by the time that Henrico executed it on August 25, 2021. Accordingly, DEQ's enforcement action commenced with its June 2020 Enforcement Conference, over one year before Plaintiffs noticed their intent to sue.

Plaintiffs cite to *Ohio Valley Env't Coal., Inc. v. Hobet Min., LLC*, 723 F. Supp. 2d 886, 906 (S.D.W. Va. 2010) in support of their argument that DEQ's action did not commence until

24

September 2021, when DEQ published the Consent Order for notice and comment. While that decision relied in part on the centrality of public participation to administrative enforcement, it also came to that conclusion, because only then, at issuance for notice and comment, did the state first cite Defendant's NPDES permit. *Id.* at 906 n.8. Indeed, the court explained that, had the state incorporated the permit earlier, it would have constituted commencement. *Id.* Here, by contrast, DEQ's NOVs themselves cite Henrico's VPDES Permit. (*See, e.g.*, April 3, 2020 NOV at 2.) Without minimizing the importance of public participation to administrative enforcement, the Court finds, as described above, that DEQ's actions bore sufficient indicia of commencing enforcement long before it issued the proposed Consent Order for notice and comment.

### 3.    Diligent Prosecution of the Action

Plaintiffs may yet avoid the jurisdictional bar of 33 U.S.C. § 1319(g)(6)(A) if they can establish that DEQ did not diligently prosecute its enforcement action. "A CWA enforcement prosecution will ordinarily be considered 'diligent' if the judicial action 'is capable of requiring compliance with the Act and is in good faith calculated to do so.'" *The Piney Run Pres. Ass'n v. The Cty. Comm'rs Of Carroll Cty., MD*, 523 F.3d 453, 459 (4th Cir. 2008) (citing *Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.*, 382 F.3d 743, 760 (7th Cir. 2004)). "Citizen-Plaintiffs must meet a high standard to demonstrate that a government agency has failed to prosecute a violation diligently." *Id.* (cleaned up) (quoting *Karr v. Hefner*, 475 F.3d 1192, 1198 (10th Cir. 2007)). Indeed, "diligence is presumed." *Id.* "This presumption is due not only to the intended role of the government as the primary enforcer of the CWA, but also to the fact that courts are not in the business of designing, constructing or maintaining sewage treatment systems." *Id.* (cleaned up). Because the diligent prosecution bar "is an exception to the jurisdiction granted in subsection (a) of § 1365, [diligence] is normally determined as of the time

25

of the filing of a complaint." *Chesapeake Bay Found. v. Am. Recovery Co.*, 769 F.2d 207, 208 (4th Cir. 1985).

Plaintiffs argue that DEQ did not diligently prosecute its action against Henrico, because (1) DEQ had not executed the 2021 Consent Order at the time that Plaintiffs filed their citizen suit, (2) the 2021 Consent Order will not bring Henrico into compliance with its Permit, because it does not include a deadline for compliance, and appears similar to previous consent orders that have proven ineffective and (3) the 2021 Consent Order does not address the concerns reflected in Plaintiffs' Complaint. (Pls.' Resp. at 13-17.)  These arguments prove unavailing.

The Court finds that Plaintiffs have failed to overcome the presumption of diligence. First, Plaintiffs incorrectly contend that courts measure diligent prosecution by reference to whether a state has filed or executed a final enforcement action.  The statutory provision does state that a final order operates as a bar to a citizen suit, but that provision functions disjunctively from the diligent prosecution provision.  33 U.S.C. § 1319(g)(6)(A) (citizen suit barred for "any violation . . . (ii) with respect to which a State has commenced and *is diligently prosecuting* an action under a State law comparable to this subsection, *or* (iii) for which the Administrator, the Secretary, or the State has issued a final order") (emphasis added).  The plain language of the statute uses the present participle phrase "is diligently prosecuting" to indicate that bar may occur while an enforcement action actively proceeds, contravening Plaintiffs' argument that prosecution must have completed.

Second, Plaintiffs fail to persuade the Court that the 2021 Consent Order could not bring Henrico into compliance with the Act.  Plaintiffs wrongly contend that the 2021 Consent Order does not impose a schedule for compliance.  Rather, the agreement incorporates three Schedules of Compliance which impose individual completion deadlines for each of the projects and

require semi-annual progress reports as well as prompt notification to DEQ of completion of each project. (2021 Consent Order 18-24.)  However, even if the 2021 Consent Order did not include a deadline for compliance, that alone would not cause sufficient concern for the Court to cast aside its required deference to the Commonwealth regarding how to ensure compliance with the Act. *See Piney Run*, 523 F.3d at 460 ("[T]he fact that the Consent Judgment does not establish a final deadline for compliance. . . . simply do[es] not establish a lack of diligence on [the state's] part.").

Additionally, as in *Piney Run*, "it cannot seriously be said that the [DEQ] enforcement action is incapable of requiring compliance with the Act." *Id.*  Here, the Consent Order documents Henrico's individual TSS, CBOD, SSO, and filter bypass incidents of Permit violations from 2016 to 2021.  It concludes that Henrico violated its Permit on those accounts.  It declares its purpose "for Henrico to return to compliance," and describes an intricate and multi-layered plan over the coming years to achieve that result.  The plan requires no less than twenty new sewer system upgrades, ten Facility projects subject to a forthcoming Corrective Action Plan and a fine of $207,680 — $155,760 of which DEQ will assess through completion of a Supplemental Environmental Project to expand water treatment services to un-served properties. These aspects of the Consent Order demonstrate that DEQ identified the problems of non-compliance and acted expediently to resolve them.  Nothing that Plaintiffs argue suggests to the Court that the 2021 Consent Order cannot achieve its purposes of bringing Henrico into compliance with the Act.  Plaintiffs argue that Henrico has a history of continuing to violate its Permit in spite of past efforts to bring the Facility into compliance through consent orders. However, those past occurrences do not demonstrate that DEQ has prosecuted Henrico with a lack of diligence in this instance.

Finally, the Consent Order does address the concerns raised in Plaintiffs' Complaint. Again, the Consent Order purposes to bring Henrico into compliance following its Permit violations for TSS, CBOD, SSOs and filter bypasses — the very claims raised in Plaintiffs' Complaint. Additionally, Plaintiffs took the opportunity to raise their concerns during notice and comment. (Enforcement Summary at 3-10; Hr'g Tr. at 113-20.) The DEQ board considered those comments, responded to them in full in a published statement, provided additional response during its December 14, 2021 board meeting and ultimately executed the 2021 Consent Order without incorporating any comments. (Enforcement Summary at 3-10; Hr'g Tr. at 113-25.)

"A citizen-plaintiff cannot overcome the presumption of diligence merely by showing that the agency's prosecution strategy is less aggressive than he would like or that it did not produce a completely satisfactory result." *Piney Run*, 523 F.3d at 459. This follows, because "Section 1365(b)(1)(B) does not require government prosecution to be far-reaching or zealous. It requires only diligence." *Id.* "Indeed, when presented with a consent decree we must be particularly deferential to the agency's expertise, and we should not interpret § 1365 in a manner that would undermine the government's ability to reach voluntary settlements with defendants." *Id.* (cleaned up). For the reasons stated, and mindful of the strong presumption of diligence, the Court finds that DEQ diligently prosecuted its enforcement action for purposes of § 1319(g)(6).

Because DEQ commenced and diligently prosecuted its administrative enforcement action against Henrico before Plaintiffs gave their NOI, § 1319(g)(6) bars Plaintiffs' claims for civil penalties.

## B.    Wholly Past Violations

Finally, Henrico moves to dismiss Counts One and Two for lack of subject matter jurisdiction and failure to state a viable claim, arguing that those counts concern wholly past violations. (Def.'s Mem. at 14-16.)  In authorizing citizen suits, the Clean Water Act provides that "any citizen may commence a civil action on his own behalf against any person . . . who is *alleged to be in violation of*" the standards of the Act. 33 U.S.C. § 1365(a) & (1) (emphasis added).  While § 1365 "does not permit citizen suits for wholly past violations," it allows suits to proceed where "citizen-Plaintiffs allege a state of either continuous or intermittent violation — that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Gwaltney*, 484 U.S. at 57, 64.  A plaintiff may do so "by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations.  Intermittent or sporadic violations do not cease to be ongoing until the date when there is no real likelihood of repetition." *Am. Canoe Ass'n v. Murphy Farms*, 412 F.3d 536, 539 (4th Cir. 2005).

Here, Counts One and Two address Henrico's February 2019 to March 2021 frequent violations of the maximum mass load and concentration effluent limitations for two non-toxic pollutant parameters, TSS and CBOD.  Henrico argues that, at the time of the filing of Plaintiffs' suit, Henrico had maintained compliance with the Permit for ten consecutive months. (Def.'s Mem. at 16-17.)  Henrico contrasts that clean record to the preceding period of time, in which it had violated the Permit in ten of fourteen months, to show that the violations have no real likelihood of repetition. (Def.'s Reply at 14.)  Plaintiffs counters that ten months of compliance cannot overcome Henrico's twenty-eight-year history of serial non-compliance with its Permit's

TSS and CBOD effluent limitations despite operating under various consent orders in that time period. (Pls.' Resp. at 21-23.)

The Court finds that Plaintiffs have sufficiently alleged a state of intermittent violation at the Henrico Water Reclamation Facility. The Complaint details Henrico's serial violations of the TSS and CBOD effluent limitations over a period of almost three decades. As a result of receiving twenty-three NOVs since opening in 1989, DEQ executed its first consent order with Henrico in 1993, requiring a schedule of compliance addressing effluent limitations. (Compl. ¶ 70.) In September 1994, DEQ had to amend its 1993 Consent Order, because "the facility has been unable to meet Permit limits for [TSS and CBOD] . . . . [as] evidenced by thirteen (13) Notices of Violation (NOVs) issued between February 5, 1993, and August 4, 1994." (Compl. Ex. E: Am. to 1993 Consent Order; Compl. ¶ 72.) DEQ issued a second consent order to Henrico in 1998. (Compl. ¶ 73.) However, Henrico again received NOVs in November 2001 and 2002 for TSS and CBOD violations. (Compl. ¶ 74.) Henrico's third consent order issued in 2003 sought "to address consistent TSS, CBOD, total phosphorus, ammonia nitrogen, and chlorine effluent violations." (Compl. ¶ 75.) Completion of the corrective actions addressing the effluent violations took until September 2007, as reflected in the 2007 Amendment to the 2003 Consent Order. (Compl. ¶ 78.) In 2010, DEQ and Henrico entered into a fourth consent order following a renewed series of effluent limit violations and SSOs. (Compl. ¶ 79.) Despite the narrower scope of that consent order, which dismissed the effluent limit violations, it required eight years for completion of the remedial measures. (Compl. ¶¶ 79, 82.)

In addition to a history of serial noncompliance, Henrico and DEQ themselves appear to express doubt that the effluent limit violations remain wholly in the past. Like the 2010 Consent Order, the 2021 Consent Order requires several years to complete the necessary remedial

30

measures "for Henrico to *return* to compliance." (2021 Consent Order ¶ C.33.)  Additionally, Henrico acknowledges that the TSS and CBOD violations coincide with "wet weather conditions" (2021 Consent Order ¶ 23), while also asserting that "[t]his challenge is compounded by the recent effects of climate change, including more frequent severe weather events and increased amounts of precipitation." (Def.'s Mem. at 2.)  Such trends suggest to the Court that Henrico may yet violate its effluent limitation limits in the intervening years before it has completed the 2021 Consent Order's upgrades required to account for increased precipitation.

As the district court found on remand in *Gwaltney*, such reasonable doubts as to future compliance — in spite of then-present compliance — suffice for the Court to find that Henrico's TSS and CBOD violations are not wholly past. *See Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd.*, 688 F. Supp. 1078, 1079 (E.D. Va. 1988) ("Despite Gwaltney's improved wastewater treatment facilities, there was no degree of certainty in June 1984 that the risk of continued violations had been eradicated.  Rather, the evidence at trial demonstrated that at the time plaintiffs filed suit, there existed a very real danger and likelihood of further violation.").  The Court finds that Plaintiffs have adequately alleged a continuing likelihood of a recurrence in intermittent or sporadic effluent limitation violations.  Because Plaintiffs sufficiently allege that Henrico remains in violation of the standards of the Act, the Court denies Defendant's Motion to Dismiss Counts One and Two.

## IV.    CONCLUSION

For the reasons set forth above, the Court will GRANT IN PART and DENY IN PART

Defendant's Motion to Dismiss.  Specifically, the Court will GRANT the Motion with regard to

the claims for civil penalties and DENY the Motion with regard to Plaintiffs' claims for

equitable relief, including as sought in Counts One and Two.

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all

counsel of record.

It is so ORDERED.

_____/s/_____

David J. Novak
United States District Judge


Richmond, Virginia
Date:  April 11, 2022